Joseph CARLINO, Jr., Joseph Carlino, Sr., Elizabeth Carlino, Kyle Rossell, Cheryl Rossell, Elwood Wrigley, Joanne Wrigley, Steven Burkhardt And Kathleen Burkhardt, Todd Evans, Robert Evans, And Mildred Evans, Plaintiffs,

v.

GLOUCESTER CITY HIGH SCHOOL, Dr. Ronald Pritchett, James Hetherington, Gloucestor City Board Of Education, Shirley Cleary, Susan Allgeier, Leroy Kramer, Barbara Stout, Stanley Booth, Chris Connelly, Board President Edward C. Hubbs, Board Vice–president Louisa W. Llewellyn, Robert Bennett, Sandra Lynch Cowgill, William F. Fisher Iii, Patrick J. Hagan, Edward L. Hutchinson, Danny O'Brien, Jr., Joseph Schili, Margery Wade, Fort Magruder Inn And Conference Center, Interstate Hotels Corp., John Travato, Security Officer Doe # 1, John Does 4–250, Jane Does 1–250, ABC Partnerships 1–50 And XYZ Corps., Individuals, Jointly, Severally, And In The Alternative, Defendants.

No. CIV.A. 98–2799.

United States District Court,
D. New Jersey.

Aug. 2, 1999.

2

4

6

Samuel A. Malat, Law Offices of Samuel A. Malat, Haddon Heights, NJ, for Plaintiffs, Joseph Carlino, Jr., Joseph Carlino, Sr., Elizabeth Carlino, Kyle Rossell, Cheryl Rossell, Elwood Wrigley, Joanne Wrigley, Steven Burkhardt, Kathleen Burkhardt, Todd Evans, Robert Evans, and Mildred Evans.

Frank P. Menaquale, Jr., Burlington, NJ, John J. Marquess,[1] Marquess, Morrison & Trimble, P.A., Turnersville, NJ, for Defendants, Gloucester City High School, James Hetherington, Gloucester City Board of Education, Shirley, Cleary, Susan Allgeier, LeRoy Kramer, Barbara Stout, Stanley Booth, Chris Connelly, Edward C. Hubbs, Louisa W. Llewellyn, Sanrda Cowgill, William F. Fisher, III, Patrick J. Hagan, Edward L. Hutchinson, Danny O'Brien, Margery Wade.

Gregory Giordano, Nancy C. Fletcher, Lenox, Socey, Wilgus, Formidoni & Casey, Trenton, NJ, for Defendant, Ronald Pritchett.

John Gerard Devlin, John Gerard Devlin & Associates, P.C., Westmont, NJ, for Defendants, Fort Magruder Inn and Conference Center, Interstate Hotels Corp., John Travato.

## OPINION

ORLOFSKY, District Judge.

## *TABLE OF CONTENTS*

I. INTRODUCTION .................................................. 9
II. FACTUAL BACKGROUND ........................................ 11
III. LEGAL STANDARD GOVERNING THE MOTIONS FOR SUMMARY JUDGMENT AND THE ORDER TO SHOW CAUSE ......................... 16
IV. DISCUSSION .................................................. 17
 A. Count One: Student Plaintiffs' Equal Protection Claim ..................... 17
 B. Counts Two and Eleven: Student Plaintiffs'Free Exercise and Separation of Church and State Claims ......................................... 20
 1. *Lee v. Weisman* ......................................... 21
 2. The *Lemon* Test ........................................ 25

---

1. There is no proof in the record or the Court docket that Defendants, Robert Bennett and Joseph Schili, have been served with a summons and complaint. Although these two defendants are listed on the summons accompanying the Amended Complaint that was served upon John Marquess, Esq., Mr. Marquess has not filed an appearance on behalf of Robert Bennett or Joseph Schili and there is no evidence in the record or the docket that he represents either individual. Therefore, Mr. Marquess could not accept service on their behalf. *See* Fed.R.Civ.P. 4(e). Since the Complaint was filed on June 15, 1998, pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, I shall issue an order to show cause why the Complaint should not be dismissed against these defendants.

 a. Secular Purpose ........................................... 25
 b. Endorsement ............................................... 25
 c. Excessive Entanglement ..................................... 26
 3. Qualified Immunity ............................................. 26
 C. Count Three: Student Plaintiffs' Due Process Claim ........................ 26
 D. Count Four: Todd Evans's Emotional Distress Claim ....................... 28
 E. Count Five: Parent Plaintiffs' Emotional Distress Claim .................... 29
 F. Count Six: Elizabeth Carlino's Retaliation Claim .......................... 30
 1. First Amendment Claim ........................................ 30
 a. Protected Activity .......................................... 31
 b. Motivating Factor .......................................... 32
 c. Would the Same Action Have Been Taken in the Absence of Protected Conduct? ........................................ 33
 d. Qualified Immunity ......................................... 33
 2. Conscientious Employee Protection Act Claim ........................... 35
 G. Counts Seven, Eight, Nine, and Ten: Fictitious Defendants ................. 36
 V. RULE 11 SANCTIONS ............................................... 36
 VI. CONCLUSION .................................................... 39

## I. INTRODUCTION

The Civil Rights Act of 1871, codified at 42 U.S.C. § 1983,[2] was enacted pursuant to Section 5 of the Fourteenth Amendment,[3] to protect the rights secured to our citizens by the Constitution and laws of the United States. *See Mitchum v. Foster*, 407 U.S. 225, 238, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972) (holding that the Civil Rights Act of 1871, codified as § 1983, was "enacted for the express purpose of 'enforc[ing] the Provisions of the Fourteenth Amendment'") (alteration in original) (quoting 17 Stat. 13 (1871)). It has served as a bulwark of liberty against persons who act "under color of state law" to deprive individuals of our most cherished constitutional rights. 42 U.S.C. § 1983.

In this case, a lawyer, who should have known better, has trivialized the Civil Rights Act of 1871, and the constitutional rights it was designed to vindicate, by filing a lawsuit that is both silly and foolish. He has invoked the Constitution and laws of the United States to protect the "rights" of unruly high school seniors who became drunk and disorderly on a Senior Class Trip, and were subsequently punished by exclusion from their high school graduation ceremony, although they were allowed to graduate and receive their diplomas.

One would have thought that the students and their parents would have been too embarrassed to seek the protection of a federal court over this tempest in a teapot. Instead, they have shamelessly proceeded in this Court as if the fate of our Republic were at stake. I have no authority to discipline these errant teenagers, and apparently their parents have chosen to litigate, rather than "parent." I can, however, discipline their attorney,

---

**2.** Section 1983 provides that:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other property proceeding for redress.

**3.** Section 1 of the Fourteenth Amendment provides, in relevant part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Section 5 of the Fourteenth Amendment provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

Samuel A. Malat, Esq., for his conduct in filing this action.

Based upon my review of the record and the law underlying the claims asserted in this case, I am led, inexorably, to the conclusion that Plaintiffs' counsel, Samuel A. Malat, Esq., has violated his obligation under Rule 11 of the Federal Rules of Civil Procedure, to perform a reasonable investigation before filing an otherwise frivolous claim. Accordingly, I will impose sanctions upon Mr. Malat, pursuant to Rule 11, by requiring him to attend two continuing legal education courses, one addressing professionalism and the rules of professional conduct, and a second course in federal civil practice and procedure. Mr. Malat shall attend *and complete* these continuing legal education courses within 18 months and file an affidavit with this Court stating that he has successfully completed both courses. In addition, Mr. Malat shall pay a fine of $500 to the Clerk of the Court within 30 days from the entry of the order filed concurrently with this Opinion.

■ Plaintiffs, Joseph Carlino, Jr., Kyle Rossell, Elwood Wrigley, Steven Burkhardt ("Student Plaintiffs"), who are former Gloucester City High School students, and their parents, Joseph Carlino, Sr., Elizabeth Carlino, Cheryl Rossell, Joanne Wrigley, and Kathleen Burkhardt ("Parent Plaintiffs"), have filed a complaint, alleging that the School Board and various school officials violated the students' constitutional rights by denying them the opportunity to participate in graduation exercises as a punishment for consuming alcohol during their senior class field trip to Busch Gardens, in Williamsburg, Virginia. Parent Plaintiffs allege that they suffered emotional distress as a result of their inability to attend their children's high school graduation. Additionally, Plaintiff, Todd Evans ("Evans"), another former Gloucester City High School student, alleges that he suffered emotional distress when he was accidentally left behind at Busch Gardens and, as a result, he was forced to take a taxicab back to the hotel where the students were staying.[4] Plaintiff, Elizabeth Carlino, the mother of Joseph Carlino, Jr., also alleges that her rights under the First Amendment and under the New Jersey Conscientious Employee Protection Act, N.J. Stat. Ann. § 34:19–3, were violated when she lost her position as freshman field hockey coach as a result of her criticism of the high school principal following these events.

Defendant, Dr. Ronald Pritchett ("Dr.Pritchett"), the principal of Gloucester City High School, has moved for summary judgment on all claims. Defendants, Gloucester City High School ("GCHS"), Gloucester City Board of Education, James Hetherington ("Superintendent Hetherington"), who is the Superintendent of Gloucester City Public Schools, Shirley Cleary, who is the Attendance Officer of GCHS, Susan Allgeier, who is Dr. Pritchett's secretary, Leroy (Lee) Kramer, who is a guidance counselor at GCHS, Stanley Booth, who is a teacher and the senior class advisor at Gloucester, Barbara Stout, who is a GCHS teacher, and Gloucester City Board of Education and its members, Edward C. Hubbs, Louisa W. Llewellyn, Sandra Lynch Cowgill, William F. Fisher,

---

4. The Amended Complaint names Todd Evans's parents, Robert and Mildred Evans, as plaintiffs, however, the Amended Complaint does not contain any claims or causes of action asserted by Robert and Mildred Evans. Robert and Mildred Evans do not have standing to assert the claims of Todd Evans, unless they sue on his behalf as his guardians. *See C.H. v. Oliva*, 990 F.Supp. 341, 349 (D.N.J. 1997) (Rodriguez, J.) (citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). Because Robert and Mildred Evans have not asserted a claim as the guardians of Todd Evans, they do not have standing to sue for the injuries allegedly sustained by their son. *See id.* Accordingly, I will dismiss Robert and Mildred Evans as parties in this action. *See Valley Forge*, 454 U.S. at 475, 102 S.Ct. 752 ("Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States.").

III, Patrick J. Hagan, Danny O'Brien, Jr., Edward L. Hutchinson, Margery Wade, Chris Connelly (collectively, the "GCHS Defendants"), have cross-moved for summary judgment on all counts.[5]

This Court, on its own motion, issued an Order to Show Cause, filed February 2, 1999, requiring Plaintiffs "to show cause why counts 1, 3–5, and 7–10 of the Amended Complaint should not be dismissed for failure to state a claim, and why sanctions should not be imposed against Samuel A. Malat, Esq., pursuant to [Federal Rule of Civil Procedure] 11, 28 U.S.C. § 1927, and the Court's inherent powers." Order, filed Feb. 2, 1999, at 1. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, because Plaintiffs assert claims under 42 U.S.C. § 1983, as well as pendant state law claims.

For the reasons set forth below, I hold that the two claims for emotional distress and the claim under the New Jersey Conscientious Employee Protection Act are statutorily barred and, therefore, frivolous. As a result, I will dismiss Count Four, containing Todd Evans's claim for emotional distress, Count Five, containing Parent Plaintiffs' claim for emotional distress, and part of Count Six, containing Elizabeth Carlino's claim under the New Jersey Conscientious Employee Protection Act. Further, I find that Plaintiffs have failed to present sufficient evidence supporting their equal protection claim (Count One), their free exercise claim (part of Count Two), and their due process claim (Count Three) and, as a result, in the absence of a genuine material issue of disputed fact, I will grant the motions for summary judgment of Dr. Pritchett and the GCHS Defendants on those claims.

In addition, I find that the individual GCHS Defendants are entitled to qualified immunity with respect to Elizabeth Carlino's claim for retaliation under the First Amendment. Thus, I will grant the motion for summary judgment of the GCHS Defendants' on Count Six, as it is asserted against the individual GCHS Defendants. Pursuant to the Order to Show Cause, filed by this Court on February 2, 1999, I will also dismiss Counts Seven, Eight, Nine, and Ten, for failure to state a claim, because these claims do not even satisfy the minimal pleading requirements set forth in Rule 8[6] of the Federal Rules of Civil Procedure.

As a result of these holdings, only the following two claims remain: (1) Student Plaintiffs' Establishment Clause claim asserted against Dr. Pritchett, Superintendent Hetherington, and the Gloucester City Board of Education and its members; and (2) Elizabeth Carlino's First Amendment retaliation claim asserted against the Gloucester City Board of Education.

## II. FACTUAL BACKGROUND

Plaintiffs, Joseph Carlino, Jr., Steven Burkhardt, Elwood William Wrigley, Kyle Rossell, and Todd Evans, then seniors at Gloucester City High School, all attended the Senior Class Trip to Busch Gardens, located in Williamsburg, Virginia. Every student planning to go on the trip had to sign and obtain a parent's signature on an authorization form, which stated, in relevant part:

Plaintiffs. To avoid confusion, and since the two motions involve an overlapping set of related defendants, I will consider the two motions as one.

**6.** Rule 8 provides, in relevant part: "A pleading which sets forth a claim for relief, whether an original claim, counter-claim, cross-claim, or third-party claim, shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief."

---

**5.** The GCHS Defendants have filed two cross-motions for summary judgment. In the first motion, filed January 21, 1999, Defendants Hetherington, Cleary, Allgeier, Kramer, Stout, Hubbs, Llewellyn, Lynch Cowgill, Fisher, Hagan, Hutchinson, O'Brien, Wade, Booth, Connelly, and GCHS, argue that this Court should grant summary judgment based on their qualified and statutory immunities. The second cross-motion, filed February 1, 1999, by GCHS and the Gloucester City Board of Education, advances various specific arguments addressing the many claims asserted by the

Possession, distribution, purchase, and[/]or consumption of alcoholic beverages, prescriptive [sic] drugs not registered with the school nurse or illegal drugs are prohibited and will be cause for terminating the trip for the person(s) involved. The parents and/or student(s) will assume all legal and financial expenses for the trip home.

Students found guilty of any of the above infractions will also be subject, upon return to school, to further disciplinary action determined by the Administration, and/or Board of Education. Specifically, seniors will lose their privilege to participate in Commencement Exercises with their class on June 17 if found guilty of drugs or alcohol related infractions. These students may have to forfeit all rights as members of their class.

*See* Brief on Behalf of Defendant, Dr. Ronald Pritchett, for Summary Judgment ("Pritchett's Brief"), dated Jan. 18, 1999, Ex. A (completed authorization form for all four Student Plaintiffs, except Todd Evans).

The seniors attending the trip and their chaperones left on Wednesday, May 28, 1997. *See id.* The group lodged at the Fort Magruder Inn, located in Williamsburg, Virginia, from Wednesday night through the morning of Friday, May 30. *See id.*[7]

On May 29, 1997, the students spent the day at Busch Gardens. *See* Amended Complaint ¶ 63.[8] At the end of the day, all of the students on the trip, except Todd Evans, returned to the Fort Magruder Inn as a group on the bus. Evans had mistakenly been "marked present upon the groups' departure from" Busch Gardens, "although he had asked [and had received] permission to enjoy one (1) more ride." *Id.* ¶ 64. As a result, Evans took a taxicab from the park, back to the hotel. *See*

Pritchett's Brief, Ex. B. Dr. Pritchett reimbursed Evans for the taxicab fare. *See id.* Nonetheless, Evans claims that he "has been emotionally damaged" by this experience. Amended Complaint ¶ 68.

The students spent the evening of May 29, 1997, at the Fort McGruder Inn. The Student Plaintiffs interpreted this free time as a license to party. One of the boys, Elwood William Wrigley ("Wrigley"), described that night as follows:

After dinner we decided to take a swim which didn't last long because the pool was closing, so we went back to our room and we tried to find something to do and I guess the only thing on our minds was to find some beer so Steve, Joe, and I decided to go to the Mobil [gas station] down the street to get some beer but before we went we went to the other rooms to see if they wanted to put up some money so they could get some beer too.... [Next] we went to our room and Kelly Ridell came and said she wanted some beer, so she gave us the money and we went out the front entrance of the hotel. It was Joe, Steve, and me. We went down to the Mobil and Steve got served and he got 14 bottle[s] of 40 oz. Colt 45 Double Malt. We decided to walk down the tracks so that no cops or any teacher could see us back on our way to the hotel. We climbed [sic] the beer up the balcony and then walked back around so everything looked normal and we actually got away with it and it's a good thing we snuck [sic] the beer up because Mr. Kramer and Mrs. Cleary were out in the hallway. They were out there because it was almost time for curfew anyway. When we got back in the room there were about ten or eleven people in the room[, including] Steve, Kyle, Joe, myself, Danielle, Aja, Dana, Nicole, Kelly, Tina and I'm pretty sure there was an-

---

7. The authorization form states that the students will stay at the "Fort McGruder Inn," however, all of the parties refer to the hotel as "Fort Magruder Inn."

8. The Amended Complaint mistakenly alleges that these events occurred in 1998, not 1997.

other person too. We all started drinking. We were passing around two bottles so that the beer wouldn't last too long and we could get rid of the bottles[. R]ight after they were done[,] I went out on the balcony and Mrs. Cleary was out there on the next balcony over and we were just talking[. T]hen Joe comes walking out with the two empty bottles in his hands[.] Right away Joe tried to hide the bottles but it was to[o] late, Mrs. Cleary had seen them and she walked around the door and started knocking right away. We were panic[k]ing and started hiding all the beer bottles all over the room. When we finally let her in it was her and Mr. Kramer and they took the empty beer bottles and another one we had started on and they sat us down and told us that they would forget about the whole thing. After they left we were still a little shook up so we didn't start drinking again right away, but we thought everything was cool again so we [sic] ... Oh yeah, when Mrs. Cleary and Mr. Kramer came into the room every one I mentioned before was still in the room and when they were leaving they told everyone to go back to there [sic] rooms. So they saw that all of those people were in the room with all of the beer at the time and later they just forgot about all those other people in the room. But we thought we were fine again so we decided to go to someone else's room and see if they wanted to sneek [sic] back out over to our room because we had a lot of beer left. So we snuck [sic] down the balcony and went over to Nadine Hoover's room. They said they would come out [to our room] ... We were all talking, drinking and just having a good time. That went on for a while[.] Then they wanted to go to bed so they left and we decided to go back out and look for different people so we climbed back down the balcony and headed over towards Aja's room. When we got there Kyle and I climbed up the balcony to knock[.] When we did[,] Mrs. Stout opened the curtain and saw Kyle ... We all took off back to our room[.] When we got back the teachers were already knocking on the door ... [W]e opened the door and it was Dr. Pritchett right there with Mrs. Cleary, Mr. Kramer, Mr[s]. Stout and the rest of the teachers.

Brief on Behalf of Defendants, Gloucester City High School and Gloucester City Board of Education, in Support of Cross–Motion for Summary Judgment ("GCHS Brief"), filed Feb. 1, 1999, Ex. F (Written Statement of Elwood William Wrigley). None of the Student Plaintiffs has denied that they consumed alcohol that night. *See, e.g., id.,* Exs. C–E (Transcripts of Interviews with Steven Burkhardt, Kyle Rossell, and Elwood William Wrigley, in which all three admit that they drank alcohol the night of May 29, 1997). Further, "[d]uring the routine room inspection and check-out at the Fort Magruder Inn, there was evidence that" the four Student Plaintiffs had consumed the alcohol contained in "the Hospitality Refreshment Center" in their room. *See* Pritchett's Brief, Ex. C (Letters from Dr. Ronald Pritchett to Parent Plaintiffs, dated June 2, 1997).

As Wrigley's statement reveals, and as the Amended Complaint confirms, Student Plaintiffs allege that other students had been drinking that evening. *See* Amended Complaint ¶ 40. Specifically, they allege that "numerous other students participated in drinking, opening liquor cabinets and the violation of curfew and the Defendant Chaperons ha[d] full knowledge of these other violations." *Id.* Wrigley wrote "when Mrs. Clearly and Mr. Kramer came into the room ... there were about ten or eleven people in the room[, including] Steve, Kyle, Joe, myself, Danielle, Aja, Dana, Nicole, Kelly, Tina and I'm pretty sure there was another person too." GCHS, Ex. F.

In response to a questionnaire about the incident, Dr. Pritchett, Susan Allgeier, his secretary, and Barbara Stout, one of the teachers chaperoning the trip, all reported

that they were not "aware of any student, other than the four, who used alcohol on the Williamsburg trip." *See* Pritchett's Brief, Ex. B (questionnaires, dated June 17, 1997). Further, in his letter to the Parent Plaintiffs, Superintendent Hetherington stated: "If you want to make accusations against some other child or chaperone you should do so in writing and I will start an investigation." *Id.*, Ex. E. There is no evidence in the summary judgment record that any of the Parent Plaintiffs, or Student Plaintiffs, came forward with the names of other students who participated in the drinking during the Senior Class Trip.

On the morning of Friday, May 30, 1997, Dr. Pritchett discovered empty bottles of alcohol in the trash and bottles missing from the "Hospitality Refreshment Center" in the hotel room that the four boys had shared.[9] *See id.*, Ex. B. In response to his discovery, Dr. Pritchett questioned the four Student Plaintiffs, none of whom denied drinking the previous night. *See id.*

On the following Monday, June 2, 1997, Dr. Pritchett sent a letter to the Parent Plaintiffs, explaining:

I regret the necessity in corresponding to you regarding an incident on the Senior Class Trip, specifically, Friday May 30, 1997. During the routine room inspection and check-out at Fort Magruder Inn, there was evidence that the Hospitality Refreshment Center was opened in [your son's] room and items missing from the inventory. I personally summoned the hospitality supervisor of the hotel assistance. Hotel management assured me each Hospitality Refreshment Center was inventoried and securely locked and sealed. Only a special key, obtained at the front desk, would be available to open the hospitality center, and provisions were made that

no student had access to this room service.

I have enclosed a list of the itemized inventory of missing food and beverages. Unfortunately, some included alcohol. I have no direct evidence of what person(s) in the room consumed the food and/or beverages. I am asking you to discuss this matter with your son. All expenses for the missing items were paid by the students (to the hotel) before our departure. I am anticipating a review of this matter by the Gloucester City Board of Education on Thursday evening, June 5, at which time any disciplinary action may or may not be determined.

*Id.*, Ex. C.

At the June 5, 1997, Gloucester City Board of Education meeting, "Dr. Pritchett[ ] reported on the Senior Class trip concerning late night student activities and the consumption of alcohol." *Id.*, Ex. D. In particular, Dr. Pritchett informed the Board of Education that the Student Plaintiffs "left the hotel[,] purchased beer," and "broke[ ] into" the "hospitality refreshment centers" to consume the "alcohol and chips" contained in them. *Id.* "Dr. Pritchett reported that [the Student Plaintiffs] received [two-]day suspensions and [he] recommended that they not participate in graduation exercises." *Id.* The "[s]tudent representative" in attendance at the meeting "commented that if students are not punished now, future students would feel they could get away with misbehaving in later years." *Id.*

Parent Plaintiffs, Joseph Carlino, Sr., Joanne Wrigley, Cheryl Rossell, and Kathy Burkhardt, also attended the meeting and had the opportunity to respond to Dr. Pritchett's report and recommendation. Joseph Carlino, Sr., "expressed his concern that liquor cabinets were in the room[ ] that students were allowed to be in and their [sic] were two exits." *Id.* He

---

9. One other student, Adam Baker, shared the same hotel room with the Student Plaintiffs. Adam Baker only received a one day suspension from school for violation of the curfew. He is not a party in this case.

also said "that his main concern was that he did not graduate with his class and worked hard to see that his son did not make the same mistakes as him [sic]." *Id.* Cheryl Rossell "[a]sked if [the] students could do something to earn the right to walk with their class in graduation." *Id.* Kathy Burkhardt requested that the Gloucester City Board of Education permit "the students [to] leave on a positive note." *Id.* None of the Parent Plaintiffs denied that their children consumed alcohol during the trip, in violation of the rules and regulations stated on the authorization form.

On June 11, 1997, six days after the Gloucester City Board of Education meeting, Superintendent Hetherington sent a letter to the Parent Plaintiffs, informing them that:

> The Board of Education upheld the decision not to let [your son] participate in Graduation. Your son can participate in Baccalaureate by requesting permission from the City Ministerium.
>
> If you want to make accusations against some other child or chaperone you should do so in writing and I will start an investigation.
>
> If you would like to appeal the Board's decision you should obtain an attorney and appeal to the Commission of Education for "An Emergent Relief Hearing" before an administrative law judge.

*Id.*, Ex. E. None of the Student or Parent Plaintiffs appealed this decision.

Instead, the Carlino family protested by posting a sign on the front of their house, which read, in substance: "The Perfect Role Model, Not GHS Principal"—suggesting that Dr. Pritchett was a poor role model for the students of GCHS. Plaintiffs'

Opposition to Defendant, Pritchett's Motion for Summary Judgment as to All Issues ("Plaintiffs' First Opposition"), dated Jan. 22, 1999, Ex. D (undated newspaper article from the *Courier-Post*).[10] The Carlino family believed that Dr. Pritchett was not a good role model, because Student Plaintiffs had observed Dr. Pritchett drinking during the senior class field trip. *See* GCHS Brief, Ex. F (Written Statement of Elwood William Wrigley); *see also* Amended Complaint ¶ 11. Thus, rather than challenging the decision to exclude Joseph Carlino, Jr., from the graduation ceremony, the Carlino family posted a sign in front of their house questioning Dr. Pritchett's fitness to punish students for drinking alcohol when he himself had done so during the trip.

In response to this sign, at its July 8, 1997, meeting, the Gloucester City Board of Education "rescinded [Elizabeth Carlino's] appointment as Freshmen Field Hockey Coach for the 1997–98 school year." Plaintiff's First Opposition, Ex. E (Letter from James H. Hetherington to Elizabeth Carlino, dated July 9, 1997). The President of the Gloucester City Board of Education, Edward Hubbs, "cited 'problems' as a reason for the decision." *Id.* (copy of an excerpt of an unlabeled, undated, newspaper article). On January 13, 1998, the Gloucester City Board of Education paid Elizabeth Carlino $1,897, the "Freshmen Hockey coach stipend of [the] Teachers' Agreement [for] 1997–1998 … to settle a grievance." Pritchett's Brief, Ex. H (Gloucester City Board of Education, Minutes of January 13, 1998, Meeting).

In addition to his family's front-lawn protest, Joseph Carlino, Jr., attempted to attend the Baccalaureate Service[11] held

---

10. Mr. Malat has submitted two different copies of Plaintiffs' "Opposition to Defendant, Pritchett's Motion for Summary Judgment as to All Issues," one dated January 22, 1999, and the other dated January 29, 1999, and each with a different set of exhibits. I will refer to the earlier one as "Plaintiffs' First

Opposition" and the later one as "Plaintiffs' Second Opposition."

11. Traditionally, a baccalaureate service is "a religious service [that forms] an integral part of … annual commencement exercises for graduating seniors." *Verbena United Methodist Church v. Chilton County Board of Educ.,*

the Friday before graduation. This ceremony was, at least nominally, sponsored by the "City Ministerium." *Id.,* Ex. I (Letter from Ronald J. Pritchett to Reverend Jane Verstoep of the Trinity United Methodist Church, dated Apr. 9, 1997). Indeed, Dr. Pritchett had written to Reverend Jane Verstoep, of the Trinity United Methodist Church, "requesting the assistance of the Gloucester City Ministerium in assigning and inviting clergy for the ... Baccalaureate Services." *Id.* In his letter, Dr. Pritchett wrote:

> You are aware that the Supreme Court has ruled that public schools may not sponsor Baccalaureate Services. Our senior class has voted overwhelmingly to have one. Would the Gloucester City Ministerium wish to continue to sponsor the Baccalaureate Services? If it does, we will need an official request for the use of the high school auditorium by the ministerium for the Service on Friday evening, June 13 at 7:00 p.m. The assignments for the Baccalaureate Service are as follows: two clergy, one for the Responsive Reading & Prayer and one for the Sermon, Invocation, and Benediction. I will need to know the clergy assignments for the Baccalaureate Service by Friday, May 30 to enable us to meet and finalize plans for the Service.

*Id.* As part of the punishment imposed by the Board of Education, Superintendent Hetherington required each Student Plaintiff to obtain "permission from the City Ministerium." *Id.,* Ex. E. Joseph Carlino, Jr., obtained such permission from Rev. Harry J. Jordan, of St. Mary's Church, however, when Joseph Carlino, Jr., attempted to attend the Baccalaureate Service, he was told by Dr. Pritchett that he should leave the school premises. *See* Amended Complaint ¶ 99.

Plaintiffs filed their Complaint on June 15, 1998, and their Amended Complaint on November 23, 1998. In their Amended Complaint, Plaintiffs essentially allege six causes of action: (1) an equal protection claim on behalf of the Student Plaintiffs; (2) a religious freedom claim on behalf of the Student Plaintiffs; (3) a due process claim on behalf of the Student Plaintiffs; (4) an emotional distress claim on behalf of Todd Evans; (5) an emotional distress claim on behalf of the Parent Plaintiffs; and (6) a retaliation claim on behalf of Elizabeth Carlino. Dr. Pritchett and the GCHS Defendants (collectively, the "Moving Defendants") have moved for summary judgment. Additionally, on February 2, 1999, this Court issued an Order to Show Cause why Plaintiffs' equal protection, due process, emotional distress, and fictitious defendant claims should not be dismissed. I will now address both motions for summary judgment, as well as the issues raised by the Order to Show Cause.

## III. LEGAL STANDARD GOVERNING THE MOTIONS FOR SUMMARY JUDGMENT AND THE ORDER TO SHOW CAUSE

Because all of the claims contained in Plaintiffs' Amended Complaint have been fully briefed as part of the Defendants' two motions for summary judgment, I will apply the legal standard governing motions for summary judgment to the issues raised by the Order to Show Cause, as well as to the two motions for summary judgment. *See* Fed.R.Civ.P. 12(b) (permitting the court to convert a motion to dismiss for failure to state a claim upon which relief may be granted into a motion for summary judgment where all parties have been "given [a] reasonable opportunity to present all material made pertinent to such a motion by Rule 56").

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

765 F.Supp. 704, 705 (M.D.Ala.1991). "The baccalaureate service [is] generally intended to honor [a] high school's graduates, and characteristically include[s] speeches, prayer, and songs with a Christian theme." *Id.* at 705–06.

of law." Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Reitz v. County of Bucks,* 125 F.3d 139, 143 (3d Cir.1997); *Hersh v. Allen Prod. Co.,* 789 F.2d 230, 232 (3d Cir.1986). In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See, e.g., Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995); *Hancock Indus. v. Schaeffer,* 811 F.2d 225, 231 (3d Cir.1987).

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains. Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion . . .; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *see also Lujan v. National Wildlife Fed.,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the

First Amended Complaint . . . with conclusory allegations of an affidavit."); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992) ("[T]o raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather must exceed the "'mere scintilla' threshold."), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). If the non-moving party fails to oppose the motion by written objection, memorandum, affidavits and other evidence, the Court "will accept as true all material facts set forth by the moving party with appropriate record support." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.,* 922 F.2d 168, 175 (3d Cir.1990) (quoting *Jaroma v. Massey,* 873 F.2d 17, 21 (1st Cir.1989)).

█ Even where the non-moving party has failed to establish a triable issue of fact, summary judgment will not be granted unless "appropriate." Fed.R.Civ.P. 56(e); *see Anchorage Assocs.,* 922 F.2d at 175. Rule 56(e) of the Federal Rules of Civil Procedure requires that the case be evaluated on its merits, with summary judgment being granted for the movant only if it is entitled to a judgment as a matter of law. *See Anchorage Assocs.,* 922 F.2d at 175.

## IV. DISCUSSION

### A. Count One: Student Plaintiffs' Equal Protection Claim

█ In the Amended Complaint, Student Plaintiffs allege that they "have been discriminated against by Defendants in that the treatment afforded them differed from that of other such students in the same situation." Amended Complaint ¶ 41.

█ "The Equal Protection Clause commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *Vacco v. Quill,* 521 U.S. 793, 117 S.Ct. 2293, 2297, 138 L.Ed.2d 834 (1997) (quoting U.S. Const.

amend. XIV, § 1). It is well-established equal protection law that "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319–20, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). "Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* at 320, 113 S.Ct. 2637; *see also City of Chicago v. Morales*, —— U.S. ——, 119 S.Ct. 1849, 1872, 144 L.Ed.2d 67 (1999) (Scalia, J., dissenting) ("Of course every activity, even scratching one's head, can be called a 'constitutional right' if one means by that term nothing more than the fact that the activity is covered (as all are) by the Equal Protection Clause, so that those who engage in it cannot be singled out without [a] 'rational basis.'") (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)).

Student Plaintiffs do not contend that they are members of a suspect class or that the ability to attend one's high school graduation ceremony involves a fundamental right. *See Palmer v. Merluzzi*, 868 F.2d 90, 96 (3d Cir.1989) ("Since participation in extra-curricular activities is not a fundamental right under the Constitution and since Palmer's suspension was not based on a suspect classification, . . . we must examine Palmer's [equal protection claim] under the 'rational relationship test.'") (citation omitted). Instead, Student Plaintiffs argue that, "[a]lthough members of a 'discrete class' are entitled to a higher level of scrutiny, [Student] Plaintiffs have not included themselves in any such class simply because it is plain that the treatment afforded them was different from the treatment of other students in the same situation." Plaintiffs' Response in Opposition to Court's Order

to Show Cause ("Plaintiffs' Response"), dated Feb. 23, 1999, at 5–6; *see also* Plaintiff's Opposition at 6–7. In other words, Student Plaintiffs claim that they have been the victims of selective enforcement.

■ "The Equal Protection Clause prohibits selective enforcement 'based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *United States v. Batchelder*, 442 U.S. 114, 125 n. 9, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979) (quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962)). Student Plaintiffs do not claim that the Moving Defendants punished them as a result of their race or religion. In the absence of an animus-based motive, I must consider Student Plaintiffs' selective enforcement claim under the "rational basis" test. Student Plaintiffs argue that "there was no rational basis for the severity of punishment that was delivered to these particular students . . . [w]hen other students who did the same, or worse" were not punished at all. Plaintiffs' Response at 6.

There is evidence in the summary judgment record that another student, Chris Johnson, purchased beer with a fake military identification card. *See* Plaintiffs' Second Opposition, Ex. A (Affidavits of Steven Burkhardt and Elwood William Wrigley, dated Jan. 28, 1999, stating that Chris Johnson purchased beer with a fake military identification card). There is no evidence, however, that Dr. Pritchett or any of the GCHS Defendants had any knowledge that any student other than the four Student Plaintiffs purchased beer.[12] Indeed, Dr. Pritchett, his secretary, Susan Allgeier, and one of the teachers chaperoning the trip, Barbara Stout, all stated that they were not "aware of any student, other than the four, who used alcohol on the Williamsburg trip." Pritchett's Brief, Ex.

---

12. There is evidence in the summary judgment record suggesting that some of the GCHS Defendants knew that other students were drinking, *see* GCHS Brief, Ex. F, however, there is no evidence indicating that any of the moving Defendants knew that other students had *purchased* alcohol.

B. Additionally, Superintendent Hetherington informed the Parent Plaintiffs: "If you want make accusations against some other child or chaperone you should do so in writing and I will start an investigation." GCHS Brief, Ex. G (Letters from James H. Hetherington, to Parent Plaintiffs, dated June 11, 1997). None of the parents came forth with any evidence. It was completely rational for the Moving Defendants to punish only those students for whom the school officials had proof that the student in question had consumed and purchased alcohol on the Senior Class Trip.

Furthermore, Wrigley's written statement indicates that the Student Plaintiffs continued to drink after being caught by the chaperones, who warned them to stop. *See* GCHS Brief, Ex. F. Thus, even assuming that other students did consume alcohol during the trip, the Moving Defendants may have believed that the conduct of the Student Plaintiffs was more egregious and, therefore, merited punishment, whereas the conduct of the other students who consumed alcohol did not demand punishment. "Where, as here, there are plausible reasons for [the Defendants'] action, [my] inquiry is at an end." *See United States R.R. Retirement Board v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980); *see also Flemming v. Nestor*, 363 U.S. 603, 612, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) (holding that, in the court's analysis of a governmental decision under the rational basis standard, "it is, of course, constitutionally irrelevant whether this reasoning in fact underlay [a governmental] decision").

■ Finally, even if the Moving Defendants incorrectly determined that only the Student Plaintiffs purchased and consumed alcohol on the Senior Class Trip, or that only the conduct of these four students warranted punishment, the GCHS Defendants correctly observe that they "are entitled to qualified immunity pursuant to federal law." Brief on Behalf of Hetherington, Cleary, Allgeier, Kramer, Stout, Hubbs, Llewelyn, Lynch, Cowgull, Fisher, Hagan, Hutchinson, O'Brien, Wade, Booth, Connelly and GCHS ("GCHS Immunity Brief"), dated Jan. 21, 1999, at 4. In *Wood v. Strickland*, the Supreme Court held that school board members are entitled to qualified immunity under § 1983, because "[c]ommon-law tradition ... and strong public-policy reasons [require] a construction of § 1983 [that] extend[s] a qualified good-faith immunity to school board members from liability for damages under the section." *Wood v. Strickland*, 420 U.S. 308, 316, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), *overruled on other grounds, Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Court concluded that:

> As with executive officers faced with instances of civil disorder, school officials, confronted with student behavior causing or threatening disruption, also have an "obvious need for prompt action, and decisions must be made in reliance on factual information supplied by others." [*Scheuer v. Rhodes*, 416 U.S. 232, 246, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).] Liability for damages for every action which is found subsequently to have been violative of a student's constitutional rights and to have caused compensable injury would unfairly impose upon the school decisionmaker the burden of mistakes made in good faith in the course of exercising his discretion within the scope of his official duties. School board members, among other duties, must judge whether there have been violations of school regulations and, if so, the appropriate sanctions for the violations. Denying any measure of immunity in these circumstances "would contribute not to principled and fearless decisionmaking but to intimidation." *Pierson v. Ray*, [386 U.S. 547, 554, 87 S.Ct. 1213 (1967) ].

*Id.* at 319, 95 S.Ct. 992. In order to use the shield of qualified immunity, the Moving Defendants "must show that their conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' "

*Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (3d Cir.1989) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)), *cert. denied*, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). "Under the test announced in *Harlow*, reasonableness is measured by an objective standard; arguments that the defendants desired to handle or subjectively believed that they had handled the incidents properly are irrelevant." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Thus, the Moving Defendants "are entitled to qualified immunity if reasonable officials in the [D]efendants' position at the relevant time could have believed, in light of clearly established law, that their conduct comported with established legal standards." *Id.*

As I concluded above, the conduct of Dr. Pritchett and the GCHS Defendants did comport with clearly established equal protection jurisprudence. Thus, I am compelled to conclude that any reasonable official acting in the same capacity as any of the Moving Defendants would have believed that the Moving Defendants did not violate the Equal Protection Clause. Dr. Pritchett and the GCHS Defendants had a rational basis upon which to impose punishment only on the Student Plaintiffs. To the extent that this decision resulted from reliance upon incorrect factual information supplied by others, *see Wood*, 420 U.S. at 319, 95 S.Ct. 992, Dr. Pritchett and the GCHS Defendants are protected by qualified immunity, because their reliance on such information was reasonable under the circumstances. Accordingly, I will grant the motions of the Moving Defendants for summary judgment on Count One of the Amended Complaint, which alleges a claim under § 1983 for a violation of the Equal Protection Clause.

**B. Counts Two and Eleven: Student Plaintiffs' Free Exercise and Separation of Church and State Claims**

Student Plaintiffs allege that the Moving Defendants have violated their First Amendment religious freedom rights by prohibiting them from attending the Baccalaureate Service, which is a religious ceremony. *See* Amended Complaint, Counts Two & Eleven. In response, Dr. Pritchett argues that "this baccalaureate mass [was] provided by an outside organization, [and Dr. Pritchett] did not prohibit the students from attending the same." Pritchett's Brief at 9. The GCHS Defendants contend that they are protected by qualified immunity. *See* GCHS Immunity Brief at 4. None of the Moving Defendants dispute that the Baccalaureate Service was religious in nature.

The First Amendment "command[s] that there should be 'no law respecting an establishment of religion[, or prohibiting the free exercise thereof.]'" *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (quoting U.S. Const., amend. I, § 1). The First Amendment "has been made applicable to the States by incorporation into the Fourteenth Amendment." *Employment Div. v. Smith*, 494 U.S. 872, 876–77, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)). "The Free Exercise Clause embraces a freedom of conscience and worship[,] ... but the Establishment Clause is a specific prohibition on forms of state intervention in religious affairs." *Lee v. Weisman*, 505 U.S. 577, 591, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (citation omitted). "[T]he Establishment Clause ... mean[s] that [the] government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs." *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 590–91, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (footnotes omitted).

The Establishment Clause forbids "[a] state-created orthodoxy[, because such orthodoxy] puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed." *Lee,* 505 U.S. at 592, 112 S.Ct. 2649. "[I]f citizens are subjected to state-sponsored religious exercises, the State disavows its own duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people." *Id.*

### 1. *Lee v. Weisman*

In *Lee v. Weisman,* Deborah Weisman and her father challenged the decision of her middle school principal, Robert E. Lee, to invite "a rabbi to deliver prayers at the graduation exercises for Deborah's class." *Id.* at 581, 112 S.Ct. 2649. Principal Lee invited Rabbi Leslie Gutterman, who accepted, and provided Rabbi Gutterman "with a pamphlet entitled 'Guidelines for Civic Occasions,' prepared by the National Conference of Christians and Jews." *Id.* The Guidelines, as well as Principal Lee, recommended that Rabbi Gutterman offer a nonsectarian invocation and benediction. *See id.*

In summarizing the legal question posed by Weisman's challenge, the Supreme Court determined that it had to consider the constitutionality of the conduct of "[a s]tate official [who] direct[s] the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools." *Id.* at 586, 112 S.Ct. 2649. The Court observed that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Id.* at 592, 112 S.Ct. 2649. The Court also noted that "[e]ven for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma." *Id.* at 586, 112 S.Ct. 2649. As a result, the Court concluded that prayer during a graduation ceremony "bore the imprint of the State and thus put school-age children who objected in an untenable position," by forcing the student to choose between religious conformity and missing graduation. *Id.* at 590, 112 S.Ct. 2649. The Court explained:

> What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy. . . . The undeniable fact is that the school district's supervision and control of a high school graduation ceremony places public pressure, as well as peer pressure, on attending students to stand as a group, or, at least, maintain respectful silence during the Invocation and Benediction. This pressure, though subtle and indirect, can be as real as any over compulsion[, because] for many, if not most, of the students at the graduation, the act of standing or remaining silent was an expression of participation in the rabbi's prayer.

*Id.* at 592–93, 112 S.Ct. 2649. Thus, "for the dissenter of high school age, who has a reasonable perception that she is being forced by the State to pray in a manner her conscience will not allow," prayer during a graduation ceremony compels religious participation, which is "forbidden by the Establishment Clause of the First Amendment." *Id.* at 593, 599, 112 S.Ct. 2649.

In the aftermath of *Lee,* the United States Court of Appeals for the Third Circuit considered the attempt of one school to hold a graduation ceremony that included a prayer without offending the First Amendment, as interpreted in *Lee. See American Civil Liberties Union v. Black Horse Pike Regional Board of Educ.,* 84 F.3d 1471 (3d Cir.1996). In *Black Horse Pike,* the Board of Education had adopted a policy that "allowed the senior class to

determine whether seniors wanted 'prayer, a moment of reflection, or nothing at all' to be included in their graduation ceremony." *Id.* at 1475. The Third Circuit determined that, under *Lee,* the Court had to "examine (1) the state's control of the graduation ceremony, and (2) the students' coerced participation in the ceremony." *Id.* at 1479. Upon consideration of these two factors, the Third Circuit held that this policy violated the First Amendment, because "[a]n impermissible practice [cannot] be transformed into a constitutionally acceptable one by putting a democratic process to an improper use." *Id.* at 1477. The Third Circuit quoted the Supreme Court's holding in *Board of Education v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), and observed:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's ... fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

*Black Horse Pike,* 84 F.3d at 1478 (quoting *Barnette,* 319 U.S. at 638, 63 S.Ct. 1178). Based on this notion, the Third Circuit concluded that it could not " 'allow the school district's delegate to make decisions that the school district [could not] make. When the senior class is given plenary power over a state-sponsored, state-controlled event such as [a] high school graduation, it is just as constrained by the Constitution as the state would be.' " *Id.* at 1483 (quoting *Harris v. Joint Sch. Dist. No. 241,* 41 F.3d 447, 455 (9th Cir.1994)).

 In this case, Dr. Pritchett contends that the Baccalaureate Service was not "state-sponsored," *see id.,* claiming that the "Gloucester City Ministerium sponsor[ed] the baccalaureate services." Pritchett's Brief at 9. In his letter to Reverend Verstoep, Dr. Pritchett wrote: "You are aware that the Supreme Court has ruled that public schools may not sponsor Baccalaureate Services. Our senior class has voted overwhelmingly to have one. Would the Gloucester City Ministerium wish to continue to sponsor the Baccalaureate Services?" *Id.,* Ex. I. Merely asking the City Ministerium to sponsor the Baccalaureate, however, does not satisfy the prohibition against state-sponsored religious events. Dr. Pritchett and the GCHS Defendants "cannot sanction coerced participation in a religious observance merely by disclaiming responsibility for the content of the ceremony." *See Black Horse Pike,* 84 F.3d at 1482. Nor can Dr. Pritchett and the GCHS Defendants rely upon the vote of the senior class to satisfy the requirements of the Establishment Clause. " '[S]chool officials cannot divest themselves of constitutional responsibility by allowing the students to make crucial decisions.' " *Id.* (quoting *Harris,* 41 F.3d at 455).

 A religious activity is "state-sponsored" under the Establishment Clause if "an objective observer in the position of a secondary school student will perceive official school support for such religious [activity]." *Board of Educ. v. Mergens,* 496 U.S. 226, 249–50, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990); *see also County of Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 593, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (holding that the a state official may not engage in conduct that "convey[s] or attempt[s] to convey a message that religion or a particular religious belief is favored or preferred' ") (quoting *Wallace v. Jaffree,* 472 U.S. 38, 70, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring)). The law applies an "objective observer" standard, because this standard determines whether the state action at issue "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Lynch v. Donnelly,* 465 U.S. 668, 688, 104

S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring).

In this case, the evidence in the summary judgment record suggests that Dr. Pritchett, in particular, and the GCHS Defendants, through Superintendent Hetherington, appeared to exercise control and had actual control over the Baccalaureate Service. First, in his letter to Reverend Verstoep, Dr. Pritchett set the date, time, and format of the service. *See id.*, Ex. I. Second, Dr. Pritchett told Reverend Verstoep that he wanted "to meet and finalize plans for the Service," indicating that Dr. Pritchett had a role in organizing the service. *Id.; see also Lee*, 505 U.S. at 629–30, 112 S.Ct. 2649 (Souter, J., concurring) (noting that a group of students "may even organize a privately sponsored baccalaureate if they desire the company of like-minded students[, b]ecause they accordingly have no need for the machinery of the State" to organize that religious event). Third, Dr. Pritchett noted that the "senior class has voted overwhelmingly to have" a baccalaureate service. Pritchett's Brief, Ex. I. A GCHS senior who had the opportunity to vote in school about whether or not to participate in such a service might well assume that the school had sponsored the event. Fourth, Dr. Pritchett and the GCHS Defendants required the Student Plaintiffs to obtain "permission from the City Ministerium" in order to attend the Baccalaureate Service. *Id.*, Ex. E. Student Plaintiffs also allege that Dr. Pritchett personally prohibited Joseph Carlino, Jr., from attending the Baccalaureate Service when on the evening of the event. Their ability to control a student's access to the service strongly suggests to an objective observer that Dr. Pritchett and the GCHS Defendants had control over the Baccalaureate Service.

Finally, "a ceremony to honor a public high school's graduates is vulnerable to carrying with it an aura of school affiliation." *Verbena United Methodist Church v. Chilton County Bd. of Educ.*, 765 F.Supp. 704, 712 (M.D.Ala.1991). In this case, the ceremony was only two days before graduation and held at the school. Further, Superintendent Hetherington referred to the Baccalaureate Service in the sentence after he informed Parent Plaintiffs that their sons could not "participate in Graduation," Pritchett's Brief, Ex. E, suggesting that the two events were both considered part of commencement exercises. "[A] commencement exercise is customarily a school-wide event within the province of school officials." *Verbena United Methodist Church*, 765 F.Supp. at 712. Considering that a baccalaureate service is generally considered "within the province of school officials," *id.*, Hetherington's requirement that the Student Plaintiffs obtain permission to attend the Baccalaureate Service and Dr. Pritchett's alleged conduct in prohibiting Joseph Carlino, Jr., from attending the service strongly suggest to an objective observer that there was official support for this religious activity. *See Mergens*, 496 U.S. at 249–50, 110 S.Ct. 2356. Thus, I find that there is a genuine material issue of disputed fact with respect to whether or not the Baccalaureate Service was sponsored by the Moving Defendants.

This conclusion appears even more clear in comparison to the court's holding in *Verbena United Methodist Church*. In that case, the court considered the free exercise claim of a church, pastor, and high school student who had been denied access to the high school auditorium to conduct a privately-organized baccalaureate service. *See Verbena United Methodist Church*, 765 F.Supp. at 705. The court concluded that the Free Exercise Clause of the First Amendment required the Board of Education to permit the church to hold a baccalaureate service,[13] however, the Establishment Clause

---

**13.** School officials may neither deny access to school facilities for religious events, *see*

*Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 113 S.Ct. 2141,

imposed upon "the Board the [heavy] duty ... to take all ... measures reasonably necessary to disassociate itself from the [service]." *Id.* at 713. Specifically, the court "require[d] the Board [of Education] and Verbena High School to take steps to disclaim any official connection to the [baccalaureate service] in their communications with students, parents, school employees, and other members of the community." *Id.* at 713–14. In addition, "[t]he Board [had to] ensure that no other school officials promote, lead, or participate in the service." *Id.*

■ In this case, school officials made no effort to disassociate themselves from the Baccalaureate Service. Instead, Dr. Pritchett, Superintendent Hetherington, and the Gloucester City Board of Education engaged in conduct suggesting to an objective observer that they did have control over the service. Nonetheless, all of the evidence in the summary judgment record and all of the allegations contained in the Amended Complaint with respect to Student Plaintiffs' Establishment Clause claim relate to the conduct of Superintendent Hetherington, Dr. Pritchett, and the Gloucester City Board of Education and its members. Consequently, I find that there is no genuine material issue of disputed fact that any other defendant violated the Student Plaintiffs' First Amendment rights. Accordingly, I will grant the motion for summary judgment of the GCHS Defendants on Student Plaintiffs' Establishment Clause claim asserted against Defendants, Shirley Cleary, Susan Allgeier, Leroy (Lee) Kramer, Stanley Booth, and Barbara Stout. I will, however, permit the Establishment Clause claim to proceed with respect to Dr. Pritchett, Superintendent Hetherington, and the Gloucester City Board of Education and its members.

■ The fact that the Student Plaintiffs were allegedly prohibited from attending, rather than coerced into participating

124 L.Ed.2d 352 (1993), nor sponsor such events. *See Lee v. Weisman,* 505 U.S. 577,

in, a religious event does not eliminate potential liability in this case. A state may no more prohibit the practice of a state-endorsed religion than coerce it, because, quite simply, a state may not endorse religious practice. As Justice Blackmun explained in his concurrence in *Lee,* "it is not enough that the government restrain from compelling religious practices: It must not engage in them either." *Lee,* 505 U.S. at 604, 112 S.Ct. 2649 (Blackmun, J., concurring, joined by Justices Stevens and O'Connor). Blackmun continued: "The mixing of government and religion can be a threat to free government, even if no one is forced to participate. When the government puts its imprimatur on a particular religion, it conveys a message of exclusion to all those who do not adhere to the favored beliefs." *Id.* at 606–07, 112 S.Ct. 2649. Indeed, Justice Souter, joined by Justices Stevens and O'Connor, wrote a separate concurrence in *Lee* to emphasize that government endorsement of religion, in the absence of coerced participation, still violates the Establishment Clause. *See id.* at 618–27, 112 S.Ct. 2649. Thus, " 'a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended.' " *Id. at* 621, 112 S.Ct. 2649 (quoting *School Dist. v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963)).

■ Furthermore, the absence of coerced participation in this case does not deprive the Student Plaintiffs of standing to sue under the Establishment Clause. "[T]he requirements for standing to challenge state action under the Establishment Clause, unlike those relating to the Free Exercise Clause, do not include proof that particular religious freedoms are infringed." *Schempp,* 374 U.S. at 225 n. 9, 83 S.Ct. 1560. Students who are "directly affected" by the alleged endorsement of reli-

112 S.Ct. 2649, 120 L.Ed.2d 467 (1992).

gion have standing to challenge that endorsement. *See id.*

The absence of any coerced participation, however, does bar Student Plaintiffs' Free Exercise claim. *See* Amended Complaint ¶ 48. A government action "that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). The evidence in the summary judgment record clearly reveals that Superintendent Hetherington's letter, which required the Student Plaintiffs to obtain permission to attend the Baccalaureate Service, was intended to punish the Student Plaintiffs' conduct on the Senior Class Trip and not to limit their religious practice. Moreover, the Student Plaintiffs do not suggest that Superintendent Hetherington's decision "discriminate[d] against some or all religious beliefs or regulate[d] or prohibit[ed] conduct because it [was] undertaken for religious reasons." *See id.* at 532, 113 S.Ct. 2217. The conduct punished was drinking on the Senior Class Trip; the alleged burden that this punishment placed on the Student Plaintiffs' free exercise of their religious beliefs was merely the incidental effect of an otherwise neutral and generally applicable decision made by Dr. Pritchett, Superintendent Hetherington, and the Gloucester City Board of Education. Accordingly, I will grant the motion for summary judgment of Dr. Pritchett and that of the GCHS Defendants with respect to the Student Plaintiffs' Free Exercise claim.

### 2. The *Lemon* Test

In *Black Horse Pike,* the Third Circuit considered both the analysis performed in *Lee* as well as the Establishment Clause test announced in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *See Black Horse Pike,* 84 F.3d at 1478, 1483. The Third Circuit observed that while "[t]he *Lemon* test has been the subject of critical debate in recent years, and its continuing vitality has been called into question by members of the Supreme Court, ... [n]evertheless, [it] remains the law of the land, and we are obligated to consider it until instructed otherwise by a majority of the Supreme Court." *Id.* at 1484. "Under *Lemon,* a government practice regarding religion will not offend the Establishment Clause if: (1) it has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not create an excessive entanglement of the government with religion." *Black Horse Pike,* 84 F.3d at 1483.

#### a. Secular Purpose

The Moving Defendants do not contest that a baccalaureate service, also known as a baccalaureate mass, is religious in nature. *See also Tanford v. Brand,* 932 F.Supp. 1139, 1145 (S.D.Ind.1996) (observing that a baccalaureate service has "religious force"); *Verbena United Methodist Church,* 765 F.Supp. at 705–06 (describing a baccalaureate service as an event "intended to honor [a] high school's graduates, [which] characteristically include[s] speeches, prayer, and songs with a Christian theme, organized and presided over by church pastors or other community religious leaders"). Thus, I find that there is no genuine material issue of disputed fact that the Baccalaureate Service had a religious, and not secular, purpose.

#### b. Endorsement

"Under the second prong of *Lemon,* a government practice can neither advance, nor inhibit religion. This means that a challenged practice must 'not have the effect of communicating a message of government endorsement or disapproval of religion.'" *Black Horse Pike,* 84 F.3d at 1485 (quoting *Lynch v. Donnelly,* 465 U.S. 668, 692, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring)). "The question under [the] endorsement analysis,

in short, is whether a reasonable observer would view such longstanding practices as a disapproval [or approval] of his or her particular religious choices." *County of Allegheny*, 492 U.S. at 631, 109 S.Ct. 3086 (O'Connor, J., concurring). Thus, this analysis is, in substance, the same as the consideration of whether or not a religious event is "state-sponsored" under the *Lee* test. I found above that there is evidence in the summary judgment record from which an objective observer could have reasonably concluded that the Baccalaureate Service was sponsored by Dr. Pritchett, Superintendent Hetherington, or Gloucester City Board of Education and its members. Consequently, I also find that, from the same evidence, a reasonable observer could conclude that those Moving Defendants, through their sponsorship of the Baccalaureate Service, conveyed a message of endorsement of religion. That is, "[t]he degree of school involvement here made it clear that the graduation prayers bore the imprint of the State." *See Lee*, 505 U.S. at 590, 112 S.Ct. 2649.

### c. Excessive Entanglement

Because I have found that there is a genuine issue of material fact with respect to the first two prongs of the *Lemon* test, I need not consider the third, more convoluted, prong. *See Black Horse Pike*, 84 F.3d at 1488; *see also Verbena United Methodist Church*, 765 F.Supp. at 711 n. 17 ("Even where it has a secular purpose and does not result in excessive entanglement, official conduct that in any way endorses religion is invalid because it 'sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'") (quoting *County of Allegheny*, 492 U.S. at 595, 109 S.Ct. 3086).

### 3. Qualified Immunity

The Moving Defendants are "entitled to qualified immunity if reasonable officials in the defendants' position at the relevant time could have believed, in light of clearly established law, that their conduct comported with established legal standards." *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (1989).

The evidence in the summary judgment record contains a proverbial "smoking gun," indicating that even Dr. Pritchett realized that school officials could not sponsor a baccalaureate service. In his letter to Reverend Verstoep, Dr. Pritchett wrote: "You are aware that the Supreme Court has ruled that public schools may not sponsor Baccalaureate Services." Pritchett's Brief, Ex. I. Thus, the Moving Defendants cannot argue that the Supreme Court precedent prohibiting school sponsorship of religious events was not "clearly established law." Further, the summary judgment record suggests that the Moving Defendants had a significant degree of involvement in the organization and control of the Baccalaureate Service. A reasonable school official would have understood that such conduct violates the Establishment Clause. Accordingly, I find that the Moving Defendants are not entitled to qualified immunity on Student Plaintiffs' Establishment Clause claim, contained in both Counts Two and Eleven. Therefore, I will deny the motions for summary judgment of Dr. Pritchett and the GCHS Defendants with respect to the Student Plaintiffs' Establishment Clause claim asserted against Dr. Pritchett, Superintendent Hetherington, and the Gloucester City Board of Education and its members. I will, however, grant both motions for summary judgment with respect to Student Plaintiffs' Free Exercise claim. Also, I will grant the motion for summary judgment of the GCHS Defendants on the Establishment Clause claim asserted against Defendants, Shirley Cleary, Susan Allgeier, Leroy (Lee) Kramer, Stanley Booth, and Barbara Stout.

### C. Count Three: Student Plaintiffs' Due Process Claim

In Count Three of the Amended Complaint, the Plaintiffs allege that they

"have been denied their property right to a public school education by Defendants without Due Process of law under the Fourteenth Amendment of the U.S. Constitution." Amended Complaint ¶ 57.

■ The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property without due process of law." U.S. Const., amend. XIV, § 1. More specifically, "due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."[14] *Goss v. Lopez*, 419 U.S. 565, 581, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). "There need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of the cases the disciplinarian may informally discuss the alleged misconduct with the student after it has occurred." *Id.* at 582, 95 S.Ct. 729. In *Goss*, the Supreme Court "stopped short of requiring that the student be given 'the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident.'" *Palmer v. Merluzzi*, 868 F.2d 90, 93–94 (3d Cir.1989) (quoting *Goss*, 419 U.S. at 583, 95 S.Ct. 729). "As long as the student 'at least ha[s] the opportunity to characterize his conduct and put it in what he deems the proper context,' ... due process has been satisfied." *Id.* (quoting *Goss*, 419 U.S. at 584, 95 S.Ct. 729). "The [Due Process] Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school." *Goss*, 419 U.S. at 584, 95 S.Ct. 729.

For example, in *Palmer*, Dan Palmer, a high school senior and "starting wide receiver on the high school's football team," had used the school radio station to complete a class assignment. *Palmer*, 868 F.2d at 91. "The next morning, beer stains and a marijuana pipe were discovered at the radio station. Later that day, Palmer, school disciplinarian Dr. Grimm, and Mr. Buckley, Palmer's former football coach, met in Mr. Buckley's office and Palmer was questioned about this discovery," at which time Palmer admitted that he "had smoked marijuana and consumed beer at the radio station" the previous evening. *Id.* at 91–92. The next day, Dr. Grimm sent Palmer's parents a letter, informing "them that their son had been assigned a ten-day out-of-school suspension," effective as of that day. *Id.* at 92. At the conclusion of the ten-day period of suspension, Palmer's father attended a Board of Education meeting, because he had "hear[d] 'rumors' concerning the possible imposition of additional sanctions on his son." *Id.* At the meeting, the school superintendent announced that he was going to impose a "sixty-day extra-curricular suspension" upon Palmer, in addition to the ten-day school suspension that Palmer had already served, thereby prohibiting Palmer from playing football for a significant part of the season. *Id.* The Board of Education "declined to intervene." *Id.* Palmer appealed to the New Jersey State Commissioner of Education. In reviewing the process that Palmer received, the United States Court of Appeals for the Third Circuit concluded that:

14. I need not consider whether exclusion from graduation exercises and a two-day suspension creates a liberty interest protected by the Due Process Clause, because Gloucester City Board of Education Policy No. 5127 provides:

The board reserves the right to deny participation in [graduation] activities and/or ceremonies when extreme circumstances warrant it, or when a pupil has not completed

the requirements for graduation with his/her class. Denial as a result of disciplinary action shall be treated as a suspension. The pupil shall be afforded the rights of review provided in policies of this board. Pritchett's Brief, Ex. F. Thus, through Policy No. 5127, the Gloucester City Board of Education has bestowed upon GCHS students a liberty interest in their right to attend their graduation.

Palmer received the process required by *Goss*. The day after the incident at the radio station, in an informal hearing with Dr. Grimm and Mr. Buckley, he was advised of what had been found in the radio station and thus of the character of the offense being investigated. He then admitted his participation in the smoking of marijuana and the drinking of beer at the station. Palmer's involvement in the activities of that evening has never been disputed.

*Id.*

The facts in this case are similar to those in *Palmer*. Here, the Student Plaintiffs had an informal hearing with Dr. Pritchett and had the opportunity to deny their involvement in the purchase and consumption of alcohol. *See* Pritchett's Brief, Ex. B. In addition, Dr. Pritchett invited the Parent Plaintiffs to the June 5, 1997, Board of Education meeting. *See id.*, Ex. C. At least one parent of each Student Plaintiff attended, however, none of the parents denied that their child had purchased and consumed alcohol on the senior class trip, in violation of school policy. Clearly, these students have had "the opportunity to characterize [their] conduct and put it in what [they] deem[ ] the proper context." *See Goss*, 419 U.S. at 584, 95 S.Ct. 729. Thus, I find that the Student Plaintiffs have not been denied due process. In short, I find that there is no genuine material issue of disputed fact with respect to Student Plaintiffs' due process claim and, accordingly, I will grant both Dr. Pritchett's and the GCHS Defendants' motions on Count Three of the Amended Complaint.

■ Finally, I am compelled to observe that the rules and regulations attached to the authorization form signed by all Student Plaintiffs [15] explicitly stated that any senior who purchases or consumes alcohol during the senior class trip "will lose their privilege to participate in Commencement Exercises with their class on June 17 if found guilty." Pritchett's Brief, Ex. A. Student Plaintiffs were aware of the consequences of drinking during the Senior Class Trip and now are simply attempting to escape them.

Student Plaintiffs argue that the opportunity to attend graduation was their "underlying interest" in going to high school, however, they seem to have forgotten about the education that they should have received during their years in high school. The immaturity of their conduct suggests that Student Plaintiffs should have learned much more in high school. In light of their behavior on the Senior Class Trip, the punishment imposed in this case is, perhaps, one of the greatest educational benefits that these students could have received in high school.

### D. Count Four: Todd Evans's Emotional Distress Claim

■ In Count Four of their Complaint, Plaintiffs allege that Todd "Evans was negligently marked present upon the groups' [sic] departure from [Busch Gardens]" and, as a result, "Evans[ ] has been emotionally damaged by Defendants, individually, jointly, severally and in the alternative, by the intentional and negligent acts complained of herein." Amended Complaint ¶¶ 64, 68.

■ New Jersey Stat. Ann. § 59:9–2.d provides, in relevant part:

No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and

---

15. The Student Plaintiffs were required to obtain the signature of at least one parent on the authorization form, however, Plaintiffs allege that some "forms were not signed by the Parents of the Student Plaintiffs, as some of the signatures had been forged immediately prior to them being handed to the homeroom proctor, who, minutes before, had provided a blank copy to these students." Plaintiffs' First Opposition at 2. Despite the admission of Student Plaintiffs that some of them forged their parents' signatures, none of the Parent Plaintiffs deny that they had knowledge of the rules and regulations of the trip.

suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000.00.

Thus, in the absence of physical injury, a plaintiff cannot recover damages for mental or emotional distress. *See Ayers v. Township of Jackson,* 106 N.J. 557, 577, 525 A.2d 287 (1987) (holding that "the [New Jersey] legislature has expressly determined that the pain and suffering occasioned by ... emotional distress is not compensable by damages" from a municipality); *see also Collins v. Union County Jail,* 150 N.J. 407, 413–17, 696 A.2d 625 (1997).

In this case, Todd Evans has not alleged that he suffered any physical injury as a result of the defendant's alleged negligent or intentional failure to ensure that he was on the bus before leaving the amusement park. Accordingly, Todd Evans's claim for emotional distress is barred by New Jersey Stat. Ann. § 59:9–2.d.

 Furthermore, I must observe that the claim contained in Count Four does not even survive the standards of a claim for emotional distress in New Jersey. Under New Jersey law: "To recover on a claim for either intentional or negligent infliction of emotional distress, [a] plaintiff is required to show, among other things, that she has suffered emotional distress 'so severe that no reasonable man could be expected to endure it.' " *Schillaci v. First Fidelity Bank,* 311 N.J.Super. 396, 406, 709 A.2d 1375 (N.J.Super.Ct.App.Div.1998) (quoting *Buckley v. Trenton Sav. Fund Soc'y,* 111 N.J. 355, 366–67, 544 A.2d 857 (1988) (quoting Restatement (Second) of Torts § 46, cmt. j (1965))). Mere "aggravation, embarrassment, an unspecified number of headaches, and loss of sleep" does not constitute emotional distress sufficiently severe to warrant compensation as a matter of law. *Buckley,* 111 N.J. at 368, 544 A.2d 857; *see also Decker v. Princeton Packet, Inc.,* 116 N.J. 418, 430, 561 A.2d 1122 (1989).

"[T]he genuineness and severity of emotional distress can present threshold questions of law," because "[u]nless a plaintiff's alleged distress is truly genuine and substantial, the tort of negligent infliction [of emotional distress] should not be broadened to permit recovery of damages." *Decker,* 116 N.J. at 430, 561 A.2d 1122.

 By any standard, the emotional distress a high school senior suffers after missing the bus back to the hotel on a Senior Class Trip is not "so severe that no reasonable man could be expected to endure it." *See id.* Such a frivolous claim clearly exceeds the outer limits of legitimate advocacy and catapults Mr. Malat into Rule 11 territory. Thus, I find that Evans has failed to state a claim for emotional distress and, even if he had, such a claim is barred by N.J. Stat. Ann. § 59:9–2. Accordingly, I will dismiss Count Four of the Amended Complaint, which contains Evans's claim for emotional distress.

### E. Count Five: Parent Plaintiffs' Emotional Distress Claim

In Count Five of the Amended Complaint, Parent Plaintiffs alleged that they "were ... made to suffer ... emotion[al] distress in their proximately [sic] by [sic] the Student Plaintiffs' [sic] being barred from participation in commencement events." Amended Complaint ¶ 74. This claim fails for three reasons.

 First, as I concluded above, Dr. Pritchett and the GCHS Defendants did not act wrongfully in barring the Student Plaintiffs from attending their graduation ceremony. "The tort involving the negligent infliction of emotional distress can be understood as *negligent conduct* that is the proximate cause of emotional distress in a person to whom the actor owes a legal duty to exercise reasonable care." *Decker,* 116 N.J. at 429, 561 A.2d 1122 (emphasis added). Because I have found that Dr. Pritchett and the GCHS Defendants did not engage in "negligent

conduct," Parent Plaintiffs cannot recover for emotional distress.

Second, Parent Plaintiffs have not alleged that they suffered any physical injury. As a result, this claim is barred by N.J. Stat. Ann. § 59:9–2, which precludes actions for emotional distress against municipal officials in the absence of allegations of physical injury, as I discussed above.

Finally, a parent's inability to watch his or her child participate in graduation exercises would not cause any reasonable person to suffer emotional distress "so severe that no reasonable man could be expected to endure it." *See Buckley*, 111 N.J. at 366–67, 544 A.2d 857. Parent Plaintiffs' contention that their suffering was so severe as to state a claim for emotional distress under New Jersey law is ridiculous and outrageous. Rather than bemoaning their inability to attend the high school graduation and implicitly condoning their children's inappropriate behavior on the Senior Class Trip, the Parent Plaintiffs should have realized that the Moving Defendants had their children's best interests in mind.

The Court further notes that the willingness of Plaintiffs' counsel, Samuel A. Malat, Esq., to file such a claim is an example of the very conduct that Rule 11 seeks to prohibit. Most parents would have punished their children for this conduct. Instead, Parent Plaintiffs, with the assistance of Mr. Malat, have filed a frivolous lawsuit that trivializes the very federal civil rights laws they seek to enforce.

16. Joseph Carlino, Sr., who is Elizabeth Carlino's husband, has asserted a claim for the violation of Elizabeth Carlino constitutional rights. As I discussed in note 2, *supra*, a plaintiff cannot assert a claim for the violation of another person's constitutional rights. *See Valley Forge Christian College v. Americans for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Accordingly, I will dismiss Joseph Carlino's Count Six claim for the violation of Elizabeth Carlino's First Amendment rights.

## F. Count Six: Elizabeth Carlino's Retaliation Claim [16]

In Count Six of the Amended Complaint, Elizabeth Carlino alleges that she displayed a sign on the front of her home that was critical of Dr. Pritchett,[17] and, in retaliation for this criticism, she was terminated from her position as freshman field hockey coach at GCHS. *See* Amended Complaint, Count Six. Elizabeth Carlino claims that this conduct violated her free speech rights as protected by the First Amendment and the Conscientious Employee Protection Act, N.J. Stat. Ann. § 34:19–3. In response, the Moving Defendants admit that Elizabeth Carlino was terminated as a result of posting this sign, but they argue that the statement conveyed by the sign was not in the public interest. *See* Pritchett's Brief at 11–13; GCHS Brief at 14–15. The Moving Defendants also argue that, even if the message conveyed by the sign was in the public interest, her free speech rights in this context are outweighed by the government's interest in providing the incoming freshman field hockey players with a good role model.

### 1. First Amendment Claim

"It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (citing *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d

17. The sign read, in substance: "The Perfect Role Model, Not GHS Principal"—suggesting that Dr. Pritchett was a poor role model for the students of GCHS. *See* Plaintiffs' First Opposition, Ex. E; *see also* Pritchett's Brief at 11 ("[Elizabeth Carlino] posted a sign on her front lawn reading 'the perfect role model; GHS Principal' [with a large backslash through the] words, 'GHS Principal' ... inferring that Dr. Pritchett was not a role model for the students of the Gloucester [City] School District.").

570 (1972)). "[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). "A public employee's claim of retaliation for engaging in a protected activity is analyzed under a three-step process." *Green v. Philadelphia Housing Auth.*, 105 F.3d 882, 885 (3d Cir.1997).

> A plaintiff must first demonstrate the activity in question was protected. Second, the plaintiff must show the protected activity was a substantial or motivating factor in the alleged retaliatory action.... Finally, defendants may defeat plaintiff's claim by demonstrating "that the same action would have been taken even in the absence of the protected conduct."

*Id.* (citation omitted) (quoting *Swineford v. Snyder County*, 15 F.3d 1258, 1270 (3d Cir.1994)).

### a. Protected Activity

To qualify as a protected activity: (1) Elizabeth Carlino's display of the sign "must constitute 'speech ... on a matter of public concern;' and (2) "the public interest favoring [the] expression 'must not be outweighed by any injury the speech could cause to the interest of the state as an employer in promoting the efficiency of the public services it performs through its employees.'" *Green*, 105 F.3d at 885 (quoting *Watters v. City of Philadelphia*, 55 F.3d 886, 892 (3d Cir.1995). "A public employee's speech involves a matter of public concern if it can 'be [of] political, social, or other concern to the community.'" *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684. When "an employee [comments] upon matters only of personal interest," that "public employee speaks not as a citizen upon matters of public policy." *Id.* at 147, 103 S.Ct. 1684. "Determining whether [conduct] is a protected activity ... is an issue of law for the court to decide." *Green*, 105 F.3d at 885.

In this case, Elizabeth Carlino expressed her disapproval of Dr. Pritchett as a role model for the students of GCHS based upon her assessment of his conduct during and after the Senior Class Trip. There is no evidence in the record to suggest that this criticism had any connection to Elizabeth Carlino's opinion of Dr. Pritchett as her employer; rather, the sign was a response to Dr. Pritchett's treatment of Elizabeth Carlino's son. In other words, Elizabeth Carlino spoke as a parent and as a citizen, and not as an employee, when she voiced her disapproval of Dr. Pritchett. *See id.*

Moreover, the ability of a high school principal to serve as a role model to high school students is clearly a matter of public concern. By comparison, in *Rankin v. McPherson*, a public employee responded to news that President Reagan had been shot by saying, "[I]f they go for him again, I hope they get him." *Rankin v. McPherson*, 483 U.S. 378, 381, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). The Supreme Court considered the context of the statement, in which Ardith McPherson had discussed race relations in the United States, and concluded that the statement "plainly dealt with a matter of public concern." *Id.* at 386, 107 S.Ct. 2891. In reaching this conclusion, the Supreme Court noted that "[t]he inappropriate or controversial character of a statement is irrelevant to the question of whether it deals with a matter of public concern." *Id.* at 387, 107 S.Ct. 2891. Thus, the controversial and unpleasant nature of Elizabeth Carlino's assessment of Dr. Pritchett does not eliminate First Amendment protection for the statement. *See id.* (" '[D]ebate on public issues should be uninhibited, robust, and wide-open and ... may well include vehe-

ment, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' ") (alteration in original) (quoting *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

 Even if a statement is made in the public interest, it may not qualify as a protected activity if "legitimate countervailing government interests are sufficiently strong." *Board of County Commissioners v. Umbehr,* 518 U.S. 668, 675–76, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). "Government employees' First Amendment rights depend on the 'balance between the interests of the [employee], as a citizen in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Id.* (quoting *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Thus, "a teacher's First Amendment rights" do not protect activities that are " 'so disruptive as to impede the teacher's performance or to interfere with the operation of the school.' " *Lake Park Educ. Ass'n v. Board of Educ.,* 526 F.Supp. 710, 717 (N.D.Ill. 1981) (quoting *McGill v. Board of Education,* 602 F.2d 774, 777 (7th Cir.1979)). "Normally, this balancing test would be an issue of fact [for] the fact finder[, b]ut where the presence of factual disputes would normally preclude the court from ruling as a matter of law, Supreme Court precedent requires the trial court to do so." *Green,* 105 F.3d at 887; *see also Connick,* 461 U.S. at 150 n. 10, 103 S.Ct. 1684.

Dr. Pritchett argues that Elizabeth Carlino's conduct at issue here "was extremely disruptive and impeded [her] ability to perform as the field hockey coach." Pritchett's Brief at 12. Specifically, Pritchett contends that "Elizabeth Carlino[ ] set an example which would teach the students that even when you break the rules and deserve discipline, it is appropriate to insult, disrespect, and publicly denigrate the figure who imposed such disci-

pline." *Id.* at 13. While this argument appears, at first blush, to be persuasive, it goes too far. If this Court were to adopt Dr. Pritchett's argument, any time a teacher or a coach made a negative comment about the school principal, that person could be fired for sending a negative message to the students that denigrating your boss is acceptable. The duty of a public school employee to serve as a role model for the students cannot eviscerate his or her First Amendment rights.

In this case, Elizabeth Carlino's conduct could not have impeded her ability to serve as the freshman field hockey coach. Even if her actions did transform her into a bad role model, this is only part of her duties as a field hockey coach. More importantly, it is not clear from the summary judgment record that any incoming freshman hockey players would extract this message from the sign the Carlinos posted. Furthermore, even if Elizabeth Carlino's conduct did convey an inappropriate message to the incoming freshman field hockey players, I find that the government's interest in providing field hockey players with a coach who is a good role model does not outweigh Ms. Carlino's interest in free speech. Thus, I find that, in these circumstances, any injury that GCHS or Dr. Pritchett suffered does not outweigh Elizabeth Carlino's interest in expressing her concern that the GCHS high school principal should not drink alcohol while chaperoning the Senior Class Trip.

#### b. Motivating Factor

The Moving Defendants concede that Elizabeth Carlino's display of the sign was the motivating factor in her termination from her position as the freshman field hockey coach. Specifically, the GCHS Defendants admit that, "[d]ue to the remarks Elizabeth Carlino was making against the Gloucester City High School principal as well as the sign placed on the Carlino's front lawn, it was the decision of the [GCHS] defendants that Elizabeth Carlino was not the proper person to be coaching students at [GCHS]." GCHS Defendants'

Brief at 14; *see also* Pritchett's Brief at 12–13. Thus, I find that the Moving Defendants terminated Carlino as a result of her protected speech, a fact about which there is no genuine material issue of disputed fact.

### c. Would the Same Action Have Been Taken in the Absence of Protected Conduct?

The Moving Defendants have not suggested, either in argument or through the presentation of evidence, that this same action would have been taken if Elizabeth Carlino had not posted the sign. Further, the Gloucester City Board of Education cites to "problems" as its sole explanation for its decision to remove Elizabeth Carlino from her position as freshman field hockey coach. *See* Plaintiffs' First Opposition, Ex. E (copy of an excerpt of an unlabeled, undated, newspaper article). Thus, I find that there is no genuine material issue of disputed fact that the same action would *not* have been taken in the absence of the protected conduct. Therefore, I find that Elizabeth Carlino has set forth a claim for retaliation in violation of her First Amendment rights, and, in turn, a violation of 42 U.S.C. § 1983.

### d. Qualified Immunity

The individual Moving Defendants are "entitled to qualified immunity if reasonable officials in the defendants' position at the relevant time could have believed, in light of clearly established law, that their conduct comported with established legal standards." *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (1989).

■ The Gloucester City Board of Education, as a municipal entity, however, is not entitled to qualified immunity. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 167, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). A municipal entity does not enjoy qualified immunity, because the intent of § 1983 is to prohibit the " '[m]isuse of power, possessed by virtue of state law and made possible only because the wrong-doer is clothed with the authority of state law.' " *Monroe v. Pape*, 365 U.S. 167, 184, 81 S.Ct. 473, 5 L.Ed.2d 492 (1941) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). "How 'uniquely amiss' it would be, therefore, if the government itself-'the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct'—were permitted to disavow liability for the injury it has begotten." *Owen v. City of Independence*, 445 U.S. 622, 651, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (quoting *Adickes v. Kress & Co.*, 398 U.S. 144, 190, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). "The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights." *Id.* at 651–52, 100 S.Ct. 1398. "Furthermore, the threat that damages might be levied against the city may encourage those in a policymaking position to institute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights." *Id.* at 652.

■ Although the Gloucester City Board of Education is not entitled to qualified immunity, its members, as well as Dr. Pritchett and the other individual GCHS Defendants named in this action, might be so entitled. As a result, I must consider the legal standard governing qualified immunity as it pertains to the conduct of Dr. Pritchett and the individual GCHS Defendants in deciding to terminate Elizabeth Carlino's employment as the freshman field hockey coach.

The Supreme Court has held that the law regarding a public employee's First Amendment protection "is clearly established." *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *see also Connick v. Myers*, 461

U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ("For at least 15 years, it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."). Nonetheless, for the purpose of the qualified immunity standard the law is only clearly established if "a reasonable official [c]ould understand that what he is doing violates that [law]." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* Thus, qualified immunity provides government officials with leeway in applying difficult or murky law, even if that law is clearly established.

"The determination whether a public employer has properly discharged an employee for engaging in speech requires 'a balance between the interest of the [employee], as a citizen, in commenting upon the matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Rankin*, 483 U.S. at 384, 107 S.Ct. 2891. This legal determination is highly fact-sensitive and "depend[s] upon the nature of the employee's expression." *Connick*, 461 U.S. at 150, 103 S.Ct. 1684. As a result, "[i]n performing the balancing, the statement [must] not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. The Supreme Court has observed that "such particularized balancing is difficult, [and] the courts must reach the most appropriate possible balance of the competing interests." *Connick*, 461 U.S. at 150, 103 S.Ct. 1684.

In applying this "difficult" and fact-sensitive test, I find that a reasonable school official could have believed, under these circumstances, that the balancing test weighed in favor of the government's interest. Although I have found that the Moving Defendant's termination of Elizabeth Carlino violated well-established First Amendment precedent, given the murkiness of the law regarding the balancing of interests, *see id.*, I cannot find that this conduct was unreasonable.

By reaching this conclusion, I am not suggesting that a government official is entitled to qualified immunity any time that he or she improperly balances the interests of the government, as an employer, with the public employee, as a citizen under the First Amendment. Surely, there are circumstances in which the outcome of that balancing test is clear and, thus, a wrong result is unreasonable. For example, if the Student Plaintiffs had not consumed alcohol on the trip, and the Carlinos nevertheless posted the same sign solely to criticize Dr. Pritchett's alleged alcohol consumption, the balancing test would clearly weigh in favor of Elizabeth Carlino, because there would be no countervailing government interest in protecting the freshman field hockey players from an alleged bad role model. Under such circumstances, the individual Moving Defendants would not be entitled to qualified immunity. In this case, however, the outcome of the balancing test is not so clear that "the unlawfulness [was] apparent." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. Because the Moving Defendants could have reasonably believed that the Carlinos intended to belittle Dr. Pritchett because he had punished Joseph Carlino, Jr., for drinking during the senior class field trip, they could have reasonably concluded that such a statement would undermine Elizabeth Carlino's ability to serve as the freshman field hockey coach. In the circumstances of this case, I cannot say that "a reasonable official would [have] underst[oo]d that" conclusion to "violate that [law]." *See id.*

I must note, however, that I reach this conclusion with some trepidation. "[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,'" *Connick*, 461 U.S. at 145, 103 S.Ct. 1684 (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980))), because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Thus, while it may be disturbing to think that school officials have leeway in determining when a public employee may be punished for exercising his or her right of free speech, these same public officials are also obligated to operate schools and, in that endeavor, the law of qualified immunity requires that school officials cannot be punished for the inaccurate application of the law in what is, at best, a murky area of constitutional law. Accordingly, I will grant the motions for summary judgment of both Dr. Pritchett and the GCHS Defendants with respect to Elizabeth Carlino's First Amendment claim as asserted against Dr. Pritchett and the individual GCHS Defendants.[18] I will, however, permit the claim to proceed against the Gloucester City Board of Education.

## 2. Conscientious Employee Protection Act Claim

The Conscientious Employee Protection Act ("CEPA") provides, in relevant part, that "[a]n employer shall not take any retaliatory action against an employee because the employee ... [d]iscloses ... to a public body an activity, policy or practice of the employer ... that the employee reasonably believes is in violation of a law, or a rule, or regulation promulgated pursu-

ant to law." N.J. Stat. Ann. § 34:19–3.a. CEPA defines a "public body" as:

(1) the United States Congress, and State legislature, or any popularly-elected local governmental body, or any member or employee thereof; (2) any federal, State, or local judiciary, or any member or employee thereof, or any grand or petit jury; (3) any federal, State, or local regulatory, administrative, or public agency or authority, or instrumentality thereof; (4) any federal, State, or local law enforcement agency, prosecutorial office, or police or peace officer; (5) any federal, State or local department of an executive branch of government; or (6) any division, board, bureau, office, committee or commission of any of the public bodies described in the above paragraphs of this subsection.

N.J. Stat. Ann. § 34:19–2.c.

To maintain a claim under CEPA, a plaintiff must show:

(1) that he or she reasonably believed that his or her employer's conduct was violating either a law or a rule or regulation promulgated pursuant to law; (2) that he or she performed the whistle-blowing activity described [in the statute]; (3) an adverse employment action was taken against him or her; and (4) a casual connection exists between the whistle-blowing activity and the adverse employment action.

*Kolb v. Burns*, 320 N.J.Super. 467, 476, 727 A.2d 525 (N.J.Super.Ct.App.Div.1999).

Elizabeth Carlino has failed to set forth allegations in the Amended Complaint or to present evidence to satisfy two of the four elements of a CEPA claim. First, the sign that the Carlinos displayed on their home implied that Dr. Pritchett was not a good role model for the school. This message in no way suggests any ille-

---

18. Qualified immunity only bars a plaintiff from seeking legal damages, but does not preclude equitable relief, such as back pay. Elizabeth Carlino has not requested back pay or any other equitable remedy. *See* Amended Complaint, Count Six. Thus, in this case, qualified immunity entitles the individual GCHS Defendants to complete protection from this claim.

gal conduct. More importantly, Elizabeth Carlino has neither alleged nor presented any evidence that she believed that Dr. Pritchett's failure to be a good role model for GCHS students was in some manner illegal or prohibited by a rule or regulation. Second, Elizabeth Carlino has neither alleged nor presented evidence suggesting that she made a "disclosure . . . to a public body." *See* N.J. Stat. Ann. § 34:19.3.a. The display of a sign on the front of a private home does not constitute disclosure to a public body. Simply put, Elizabeth Carlino has asserted a frivolous CEPA claim.

Accordingly, I will grant the motions for summary judgment of Dr. Pritchett and the GCHS Defendants on Elizabeth Carlino's CEPA claim.

### G. Counts Seven, Eight, Nine, and Ten: Fictitious Defendants

"Doe defendants 'are routinely used as stand-ins for real parties until discovery permits the intended defendants to be installed.'" *Hindes v. FDIC*, 137 F.3d 148, 155 (3d Cir.1998) (quoting *Scheetz v. Morning Call, Inc.*, 130 F.R.D. 34, 36 (E.D.Pa.1990)). Nonetheless, "[a] pleading which merely contains bare allegations of liability, without pleading facts giving rise to this liability, does not adequately provide the opposing party with notice of the nature of the claim asserted." *Kirschner v. Castello*, Civil Action No. 91–5985, 1992 WL 191153, at *2 (E.D.Pa. Aug.3, 1992) (citing *Walker v. South Central Bell Telephone*, 904 F.2d 275 (5th Cir.1990)); *accord* New Jersey Court Rule 4:26-4 ("[I]f the defendant's true name is unknown to the plaintiff, process may issue against the defendant under a fictitious name, stating it to be fictitious and *adding an appropriate description sufficient for identification*.") (emphasis added). Although "the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his

claim," *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), "more than bare allegations of legal conclusions are required to satisfy th[e] policy of fair notice in federal pleadings." *Kirschner*, 1992 WL 191153, at *2. "Federal Rule of Civil Procedure 8 outlines the requirements for proper pleading. As the Supreme Court noted in *Conley* . . ., Rule 8 basically requires that a pleading provide sufficient notice to the defendant of the type of litigation that this involved." *Barnhart v. Compugraphic Corp.*, 936 F.2d 131, 135 n. 7 (3d Cir.1991).

In their Amended Complaint, Plaintiffs have asserted claims against John Does, Jane Does, XYZ Corporations, and ABC Partnerships, alleging that "Plaintiffs have been damaged by Defendants, individually, jointly, severally and in the alternative." *See* Amended Complaint ¶¶ 86, 89, 92, 95. This allegation does not give notice of the type of litigation, the claim asserted, or the facts underlying the claim. Thus, I find that this claim does not even meet the minimal pleading requirements of Rule 8. Accordingly, pursuant to the Order to Show Cause, filed by this Court on February 2, 1999, I will dismiss Counts Seven, Eight, Nine, and Ten, which assert claims against fictitious defendants.

## V. RULE 11 SANCTIONS

On February 2, 1999, this Court issued an Order to Show Cause why Plaintiffs' counsel, Samuel A. Malat, Esq., should not be sanctioned, pursuant to Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the Court's inherent powers, for filing frivolous claims. Thus, as required by Rule 11(c), Mr. Malat has had "notice and a reasonable opportunity to respond." Fed.R.Civ.P. 11(c).

Rule 11 of the Federal Rules of Civil Procedure [19] "imposes on counsel a

---

19. Rule 11 provides, in relevant part:

(b) **Representations to Court.** By presenting to the court (whether by signing, filing,

duty to look before leaping and may be seen as a litigation version of the familiar railroad crossing admonition to 'stop, look, and listen.'" *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 157 (3d Cir.1986). More specifically, Rule 11 "requires an attorney who signs a complaint to certify both that it is not interposed for improper purposes, such as delay or harassment, and that there is a reasonable basis in law and fact for the claim." *Napier v. Thirty or More Unidentified Federal Agents, Employees or Officers*, 855 F.2d 1080, 1090 (3d Cir.1988) (footnote omitted); *see also Slater v. Skyhawk Transp., Inc.*, Civil Action No. 97–1853, 1999 WL 261728, at *15 (D.N.J. May 4, 1999) (Orlofsky, J.). "Rule 11 therefore is intended to discourage [claims] that are 'frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed in subjective bad faith.'" *Napier*, 855 F.2d at 1090 (quoting *Lieb*, 788 F.2d at 157 (quoting *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831 (9th Cir.1986))).

"The legal standard to be applied when evaluating conduct allegedly violative of Rule 11 is reasonableness under the circumstances." *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 289 (3d Cir.) (citing *Business Guides, Inc. v. Chromatic Communications Enters., Inc.*, 498 U.S. 533, 546–47, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991)), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). "[R]easonableness is defined as an 'objective knowledge or belief at the time of the filing of a challenged paper' that the claim was well-grounded in law and fact." *Id.* (quoting *Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1359 (3d Cir.1990)). "Bad faith is not required." *Martin v. Brown*, 63 F.3d 1252, 1264 (3d Cir.1995). Thus, the standards under Rule 11 "eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." Fed.R.Civ.P. 11, adv. cmte. notes.

"The rule requires a reasonable inquiry into both the facts and the law supporting a particular pleading." *Schering Corp. v. Vitarine Pharm., Inc.*, 889 F.2d 490, 496 (3d Cir.1989). "At a minimum, Rule 11 requires 'unambiguously that any signer must conduct a reasonable inquiry or face sanctions." *Business Guides*, 498 U.S. at 547, 111 S.Ct. 922. Nonetheless, sanctions are warranted "only in the 'exceptional circumstance' where a claim or motion is patently unmeritous or frivolous." *Doering v. Union County Bd. of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir.1988) (citations omitted).

The Amended Complaint, which was signed by Samuel A. Malat, Esq., and verified by all of the Plaintiffs, contains three "patently frivolous" claims that are statutorily barred, namely, the two claims for emotional distress (Counts Four and Five) and the CEPA claim (Count Six).

submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, ... [that] (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law....

(c) **Sanctions**. If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.... A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected.... Monetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2).

Fed.R.Civ.P. 11(b) & (c).

*See id.* Thus, these "claims [were not] warranted by existing law." *See* Fed. R.Civ.P. 11(b)(2). Nor have the Plaintiffs made any argument suggesting that these claims are "warranted ... by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." *Id.* Mr. Malat has not provided any explanation for his failure to conduct any legal investigation before filing these claims.

Moreover, the Order to Show Cause, issued by this Court, provided Mr. Malat with clear notice that he had to conduct legal research, yet, he failed to do so. *See* Fed.R.Civ.P. 11, adv. cmte. notes (noting that Rule 11 "subject[s] litigants to potential sanctions for insisting upon a position after it is no longer tenable" and "provid[es] protection against sanctions if they withdraw or correct contentions after a potential violation is called to their attention"). Mr. Malat's signature on Plaintiffs' Response in Opposition to [the] Court's Order to Show Cause, which argues in support of these claims, clearly demonstrates that Mr. Malat has conducted absolutely no legal research whatsoever regarding these claims at any time before *or during* the pendency of this litigation. "Even a casual investigation, let alone the reasonable inquiry required by Rule 11, *see* Fed.R.Civ.P. 11(b), would have revealed" that the New Jersey Statutes Annotated prohibit both emotional distress claims and the CEPA claim. Such a flagrant failure to conduct any legal research violates Mr. Malat's obligations under Rule 11(b).[20]

Furthermore, Plaintiffs' equal protection and due process claims trivialize the civil rights that those bedrock constitutional principles are designed to protect. Student Plaintiffs have admitted that they violated school regulations by drinking during their Senior Class Trip. Now these same students seek legal redress to avoid the punishment they were warned they would receive for such conduct. In addition, the suggestion that Parent Plaintiffs would suffer severe emotional distress as a result of their inability to see their children graduate is preposterous. Nonetheless, Rule 11(c) precludes the imposition of monetary sanctions upon a represented party for a violation of Rule 11(b), as I have found exists here. I also find that it would be inappropriate to sanction the Plaintiffs in this case, because they do not have the legal training to understand the frivolousness and triviality of their claims. The Plaintiffs relied on their lawyer, Mr. Malat, to perform the legal research. Mr. Malat has clearly failed to discharge this obligation to his clients.

Moreover, Mr. Malat has also failed to discharge his obligations to the legal profession and this Court. The "Principles of Professionalism for Lawyers and Judges," adopted by the New Jersey Commission on Professionalism in the Law, requires: "Clients should be advised against pursuing a course of action that is without merit. ... A lawyer must avoid frivolous litigation and non-essential pleading in litigation." While these Principles of Professionalism are purely aspirational, and do not serve as the basis of this Court's decision to sanction Mr. Malat pursuant to Rule 11, my colleague, Judge Bassler, eloquently explained why members of the legal profession must conform to standards of professional responsibility when he wrote:

> The practice of law requires respect for, and adherence to, standards of conduct. It is compliance with those standards that serve to define what it means to be a member of a profession. It is the obligation of every attorney to ensure that the public's trust in the judicial process is maintained.

*Kramer v. Tribe,* 156 F.R.D. 96, 110 (D.N.J.1994). By filing such patently friv-

---

**20.** "Having concluded that a sanction is warranted under Rule 11 .... I need not consider whether a sanction is warranted under 28 U.S.C. § 1927, or the Court's inherent powers." *Thomason v. Norman E. Lehrer, P.C.,* 182 F.R.D. 121, 129 (D.N.J.1998).

olous claims, Mr. Malat has not only violated Rule 11; he has failed to adhere to these Principles of Professionalism.

Mr. Malat filed three claims that are patently frivolous. The CEPA claim is precluded by the very statute under which it was filed and the two emotional distress claims are clearly barred by other statutes. With just a few minutes of legal research, Mr. Malat could easily have discovered this information, however, despite ample opportunities to conduct legal research and in the face of an Order to Show Cause, Mr. Malat chose to file and continue to litigate what can only be described as patently frivolous claims, in violation of Rule 11(b). Further, Mr. Malat filed claims that, although not frivolous, trivialized cherished constitutional rights and the federal civil rights statute that was enacted to protect those rights. As a result, I conclude that, by filing and continuing to prosecute the Amended Complaint, Mr. Malat has violated Rule 11.

 Since I have determined that Mr. Malat violated Rule 11(b), I now must determine what sanction, if any, is appropriate. "The appropriate sanction is one which 'is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated.'" *Thomason v. Norman E. Lehrer, P.C.,* 182 F.R.D. 121, 131 (D.N.J.1998) (quoting Fed.R.Civ.P. 11(c)(2)); *see also Doering v. Union County Bd. of Chosen Freeholders,* 857 F.2d 191, 194 (3d Cir.1988). "The sanction may consist of, or include, directives of a nonmonetary nature, or an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." Fed.R.Civ.P. 11(c)(2). Thus, "what is 'appropriate' may be a warm-friendly discussion on the record, a hard-nosed reprimand in open court, compulsory legal education, monetary sanctions, or other measures appropriate to circumstances." *Langer v. Monarch*

*Life Ins. Co.,* 966 F.2d 786, 810 (3d Cir. 1992). Most importantly, in determining the appropriate sanction to impose, the court should consider "the particular facts of [the] case," *Lieb,* 788 F.2d at 158, and "utilize the sanction that furthers the purposes of Rule 11 and is the least severe sanction adequate to such purpose." *Langer,* 966 F.2d at 810.

In this case, I find that the combination of a monetary and a nonmonetary sanction would best deter future similar conduct. Accordingly, I will order Mr. Malat to attend two continuing legal education courses within the next 18 months. He must attend one course which addresses attorney professionalism and the rules of professional conduct. The second course must cover federal practice and procedure. These two courses must be offered by a law school accredited by the American Bar Association, or a reputable provider of continuing legal education. *See Thomason,* 182 F.R.D. at 132 n. 4. Mr. Malat shall file an affidavit with the court certifying that he has completed both courses and describing the content of each course. Additionally, I will require Mr. Malat to pay a fine of $500 to the Clerk of the Court within 30 days. I can only hope that the imposition of these two sanctions will educate Mr. Malat about his duties under Rule 11 and his professional obligations to his clients, the legal profession, and this Court.

## VI. CONCLUSION

For the reasons set forth above, I hold that the two claims for emotional distress (Counts Four and Five), and the claim under the New Jersey Conscientious Employee Protection Act (part of Count Six) are statutorily barred and, therefore, frivolous. As a result, I will dismiss Count Four, containing Todd Evans's claim for emotional distress, Count Five, containing Parent Plaintiffs' claim for emotional distress, and part of Count Six, containing Elizabeth Carlino's claim under the New Jersey Conscientious Employee Protection

Act. Further, I find that Plaintiffs have failed to present sufficient evidence supporting their equal protection claim (Count One), their free exercise claim (part of Count Two), and their due process claim (Count Three) and, therefore, in the absence of a genuine material issue of disputed fact, I will grant the motions for summary judgment of Dr. Pritchett and the GCHS Defendants on those claims.

In addition, I find that the individual GCHS Defendants are entitled to qualified immunity with respect to Elizabeth Carlino's claim for retaliation under the First Amendment. Thus, I will grant the motions for summary judgment of Dr. Pritchett and the GCHS Defendants' on Count Six, as asserted against Dr. Pritchett and the individual GCHS Defendants. Pursuant to the Order to Show Cause, filed by this Court on February 2, 1999, I will dismiss Counts Seven, Eight, Nine, and Ten, for failure to state a claim upon which relief may be granted.

As a result of these holdings, only the following two claims remain before this Court: (1) Student Plaintiffs' Establishment Clause claim asserted against Dr. Pritchett, Superintendent Hetherington, and the Gloucester City Board of Education and its members (part of Count Two); and (2) Elizabeth Carlino's claim for retaliation under the First Amendment, asserted against the Gloucester City Board of Education (part of Count Six). Additionally, my holdings here result in the dismissal of Plaintiffs, Robert Evans, Mildred Evans, Joseph Carlino, Sr., Cheryl Rossell, Joanne Wrigley, and Kathleen Burkhardt, and Defendants, Shirley Cleary, Susan Allgeier, Leroy (Lee) Kramer, Barbara Stout, and the fictitious defendants, as parties in this case. *See supra* notes 4 & 14. I will issue an order to show cause why Defendants, Robert Bennett and Joseph Schili, should not be dismissed as parties as a result of the Plaintiffs' failure to serve these two defendants with a summons and a copy of either the Com-

plaint or the Amended Complaint. *See supra* note 1.

Finally, based upon my review of the record and the law underlying the claims asserted in this case, I find that Plaintiffs' counsel, Samuel A. Malat, Esq., has violated his obligation under Rule 11(b) of the Federal Rules of Civil Procedure, to perform a reasonable investigation before filing an otherwise frivolous claim. Accordingly, I will impose sanctions upon Mr. Malat, and require him to attend the two continuing legal education courses described above, within 18 months from the entry of the order filed concurrently with this Opinion, and pay a fine of $500 to the Clerk of the Court within 30 days from the entry of the order filed concurrently with this Opinion. Mr. Malat shall file an affidavit with this Court certifying that he has completed both courses and describing the content of each course.

## ORDER

This matter having come before the Court on the motion of Defendant, Dr. Ronald Pritchett ("Dr.Pritchett"), for summary judgment, and on the cross-motions of Defendants, Gloucester City High School, Gloucester City Board of Education, James Hetherington, Shirley Cleary, Susan Allgeier, Leroy (Lee) Kramer, Barbara Stout, Stanley Booth, Chris Connelly, Edward C. Hubbs, Louisa W. Llewellyn, Sandra Lynch Cowgill, William F. Fisher, III, Patrick Hagan, Edward Hutchinson, Danny O'Brien, Jr., and Margery Wade (collectively, the "GCHS Defendants"), for summary judgment, and on the Order to Show Cause, filed by this Court on February 2, 1999, Samuel A. Malat, Esq., appearing on behalf of the Plaintiffs, Joseph Carlino, Jr., Joseph Carlino, Sr., Elizabeth Carlino, Kyle Rossell, Cheryl Rossell, Elwood Wrigley, Joanne Wrigley, Steven Burkhardt, Kathleen Burkhardt, Todd Evans, Robert Evans, and Mildred Evans; and,

This Court having considered the submissions of the parties, and for the reasons

set forth in the OPINION filed concurrently with this ORDER;

IT IS, on this 2nd day of August, 1999, HEREBY ORDERED that:

1. The motions for summary judgment of Dr. Pritchett and the GCHS Defendants are GRANTED in part and DENIED in part;

2. The motions for summary judgment of Dr. Pritchett and the GCHS Defendants are DENIED with respect to: (a) the Establishment Clause Claim asserted by Plaintiffs, Joseph Carlino, Jr., Kyle Rossell, Steven Burkhardt, and Elwood Wrigley, against Dr. Pritchett, Superintendent James H. Hetherington, and the Gloucester City Board of Education and its members; and (b) the claim for retaliation under the First Amendment asserted by Elizabeth Carlino against the Gloucester City Board of Education;

3. The motions for summary judgment of Dr. Pritchett and the GCHS Defendants are GRANTED in all other respects;

4. Plaintiffs, Robert Evans, Mildred Evans, Joseph Carlino, Sr., Cheryl Rossell, Joanne Wrigley, and Kathleen Burkhardt, and Defendants, Shirley Cleary, Susan Allgeier, Leroy (Lee) Kramer, Barbara Stout, and the fictitious defendants, are DISMISSED as parties in this case;

5. Pursuant to the Court's decision to impose Rule 11 sanctions, Plaintiffs' counsel, Samuel A. Malat, Esq., shall attend one continuing legal education course addressing attorney professionalism and the rules of professional conduct and one continuing legal education course covering federal practice and procedure, within 18 months from the entry of this ORDER. These courses shall be provided by a law school accredited by the American Bar Association or some other reputable provider of continuing legal education. Upon successful completion of both courses, Mr. Malat shall file an affidavit with this Court describing each course and certifying that he has successfully completed both courses. Additionally, Samuel A. Malat, Esq., shall pay a fine of $500 to the Clerk of the Court within 30 days from the entry of this ORDER.