**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1583
_____

ELLSWORTH D. PATTERSON, JR.;
KAREN PATTERSON, individually and as h/w,
                                        Appellants

v.

GLORY FOODS, INC.; MCCALL FARMS, INC.; JOHN DOES 1-10
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-10-cv-06831)
District Judge:  Honorable Freda L. Wolfson
_____

Submitted Under Third Circuit LAR 34.1(a)
February 11, 2014
_____

Before: CHAGARES, SHWARTZ, and ALDISERT, Circuit Judges.

(Filed: February 19, 2014)
_____

OPINION
_____

SHWARTZ, Circuit Judge.

Plaintiff Ellsworth D. Patterson, Jr. appeals the District Court's orders granting

summary judgment to Defendants Glory Foods, Inc. and McCall Farms, Inc. on his claim

under the New Jersey Conscientious Employee Protection Act ("CEPA") and denying his motion for reconsideration. We will affirm.

## I.

As we write principally for the benefit of the parties, we recite only the essential facts[1] and procedural history. Glory Foods, a company that sells southern-style vegetable products to wholesalers and supermarkets, hired Patterson as an Area Sales Manager in October 2008. Patterson began work for Glory Foods in 2008 and reported to Lisa Cliff, who in turn reported to the President of Glory Foods, Jacqueline Neal.

Before Patterson joined Glory Foods, Wakefern, a supermarket company that purchased products from Glory Foods, incurred a debt to Glory Foods of approximately $200,000.[2] When the debt was discovered, Glory Foods agreed to an accrual program with Wakefern, whereby Wakefern would advertise Glory Foods products and attempt to increase its sales of Glory Foods products in lieu of paying the money it owed. The agreement was never memorialized in writing. The accrual program ended in 2008, and Patterson had no role in it. Patterson first learned about Wakefern's failure to pay and the accrual program in mid-2009 during a conversation with his predecessor, although Patterson then understood the debt to be only $100,000. In January 2010, Patterson attended a meeting with Dan Charna, an owner of Glory Foods, and executives from

---

[1] In accordance with our standard of review, see infra Section II, we set forth the facts in the light most favorable to Patterson. Skerski v. Time Warner Cable Co., 257 F.3d 273, 278 (3d Cir. 2001).

[2] The parties dispute the amount of the debt. According to Patterson's supervisor, the debt was approximately $86,000. The issue is not material to the disposition of this case.

McCall Farms, which was then merging with Glory Foods. During the meeting, Charna said that Wakefern "stole" $200,000 when it failed to pay the correct price for the products. JA 62. Patterson later asked Cliff about the accrual program, and she told him the program had ended before his employment began. Patterson later determined that sales to Wakefern had declined significantly after the accrual program ended, so he attempted to re-start the program.

On February 24, 2010, Neal emailed the sales team, including Patterson, asking that each person review his or her clients and let her know of "comments, questions or insight" for an upcoming sales meeting. JA 32. Patterson sent a lengthy response that noted, among other things, the decline in sales to Wakefern that he attributed to the end of the accrual program. Cliff, who was copied on the email, responded to Patterson, instructing him not to email Neal directly.[3] For her part, Neal responded directly to Patterson and asked for more information. In response, Patterson wrote in an email on March 1, 2010, that "[t]here was an accrual program in place at Wakefern prior to my arrival to the company. This program was set up to recoup the $100-200,000 over payment[4] to Wakefern." JA 26. Patterson did not indicate in the email that he suspected that the accrual program was unethical or illegal.

_____

[3] The record includes an email that Cliff sent to Patterson in 2009, instructing him not to send emails directly to Neal without speaking to Cliff first.

[4] Cliff testified at her deposition that Wakefern incurred the debt by taking unauthorized deductions on some of its purchases, resulting in an underpayment, and that Patterson's description of the discrepancy as an "overpayment" was incorrect. At his deposition, Patterson also testified that the debt arose because Wakefern took unauthorized discounts on its purchases, but he, nonetheless, described this problem as an "overpayment" by Glory Foods to Wakefern.

3

Eleven days later, Neal and Cliff terminated Patterson's employment. Neal and Cliff told him that their decision was based on the merger between Glory Foods and McCall Farms, which occurred in January 2010, and conflicts between Patterson and Cliff.[5]

Patterson and his wife filed this lawsuit on December 30, 2010, alleging: (1) wrongful termination; (2) violation of CEPA; and (3) loss of consortium. With the parties' consent, the District Court dismissed Counts 1 and 3. Discovery followed on Patterson's CEPA claim. The District Court granted summary judgment in favor of the Defendants on that claim, and denied Patterson's motion for reconsideration pursuant to Fed. R. Civ. P. 59. Patterson now appeals.

## II.

The District Court had jurisdiction in this case pursuant to 28 U.S.C. § 1332(a). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We exercise plenary review on an appeal from summary judgment, applying the same standard as the District Court. Tri-M Grp., LLC v. Sharp, 638 F.3d 406, 415 (3d Cir. 2011). When considering a motion for summary judgment, we "must draw all reasonable inferences from the underlying facts in the light most favorable to the non-moving party." Skerski, 257 F.3d at 278 (citation omitted). We will affirm an order for summary judgment only if "there is no genuine issue as to any material fact and [] the moving party is entitled to judgment as

---

[5] Before Patterson sent his March 1, 2010 email responding to Neal, Cliff emailed him and another sales employee concerning a task that needed to be completed within two hours of the email, which Patterson did not complete. Patterson later alleged that he was set up to fail at this task to justify his termination.

4

a matter of law." Ruehl v. Viacom, Inc., 500 F.3d 375, 380 n.6 (3d Cir. 2007) (internal

quotation marks and citation omitted). A disputed issue is "genuine" only if there is a

sufficient evidentiary basis on which a reasonable jury could find for the non-moving

party. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

**III.**

CEPA was enacted "to protect and encourage employees to report illegal or

unethical workplace activities and to discourage public and private sector employers from

engaging in such [activities]." Abbamont v. Piscataway Twp. Bd. of Educ., 650 A.2d

958, 971 (N.J. 1994). It provides, in relevant part:

> [a]n employer shall not take any retaliatory action against an employee
> because the employee does any of the following:
>
>> a. Discloses, or threatens to disclose to a supervisor or to a
>> public body an activity, policy or practice of the employer . . .
>> that the employee reasonably believes: (1) is in violation of a
>> law, or a rule or regulation promulgated pursuant to law . . . ;
>> or (2) is fraudulent or criminal . . . .

N.J. Stat. Ann. § 34:19–3.[6] To succeed on a CEPA claim, a plaintiff must show (1) he or

she reasonably believed that his or her employer's conduct was violating a law, rule, or

---

[6] The statute also protects an employee who:

> [o]bjects to, or refuses to participate in any activity, policy or practice
> which the employee reasonably believes: (1) is in violation of a law, or a
> rule or regulation promulgated pursuant to law . . . ; (2) is fraudulent or
> criminal . . . ; or (3) is incompatible with a clear mandate of public policy
> concerning the public health, safety or welfare or protection of the
> environment.

5

regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a whistleblowing activity described in CEPA; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistleblowing activity and the adverse employment action. Caver v. City of Trenton, 420 F.3d 243, 254 (3d Cir. 2005).[7]

**A.**

Patterson contends that the fact that he was not informed of the accrual program with Wakefern and that the entire debt may not have been recouped are evidence of either a kickback scheme, or that the shareholders were not fully informed of the failure to collect this debt. Patterson's mere assertions that he believed that wrongdoing occurred, however, cannot defeat summary judgment, without some evidence to support them. See, e.g., Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991) (holding that the party opposing summary judgment "must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations, general denials, or . . . vague statements").

---

N.J. Stat. Ann. § 34:19–3(c). Patterson asserts a claim under this section of the statute as well, but he fails to identify any ongoing activity to which he objected or in which he refused to participate.

[7] If a plaintiff demonstrates a prima facie case, we apply the burden-shifting analysis from federal discrimination cases, which requires that the employer articulate a legitimate, non-discriminatory reason for its actions, after which the burden shifts back to the plaintiff to show that the legitimate reason is pretextual. Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 92 (3d Cir. 1999). In this case, the District Court also held that even if Patterson had presented a prima facie case, he had failed to show that Defendants' legitimate, non-retaliatory reasons for firing him—including his missed deadlines, his failure to respect the chain of command, and the merger—were pretextual. JA 185 n.12. Because we agree with the District Court that Patterson has failed to set forth a prima facie case, we need not engage in this analysis.

6

First, while Patterson argues that a fraud or kickback scheme occurred, he cites no evidence to support that theory. At his deposition, he admitted that he had no "specific[]" evidence of a kickback scheme, and based his conclusion on the fact that there was no indication any Glory Foods employee attempted to recover the money Wakefern owed. JA 55-56. He stated that "[f]rom [his] experience as a sales professional any time someone don't try to recover money there's a possibility there is a kickback or some deal going on . . . ." JA 110. In other words, from Patterson's perspective, illegal activity is likely afoot any time a debt is forgiven. Forgiveness of a debt violates no law or public policy. See Young v. Schering Corp., 645 A.2d 1238, 1246 (N.J. Super. Ct. App. Div. 1994) (affirming dismissal of a complaint where the challenged conduct "was not unlawful or wrongful in any way," and "did not contravene any clear mandate of public policy"). Moreover, Patterson does not explain the logic by which he inferred that such a basic business activity—Wakefern incurring and repaying a debt, and Glory Foods forgiving some of that debt—was part of some illegal scheme. Patterson's assertions of wrongdoing, unsupported by any evidence, are far too speculative to defeat summary judgment.

Second, Patterson argues that the District Court overlooked facts that demonstrated that he had a reasonable basis to believe that, by forgiving some amount of the Wakefern debt, "fraud had been committed on the shareholders of Glory Foods" and its owners because they may not have been aware of the debt forgiveness. Appellant Br. 13-14. That argument fails for two reasons. First, he provides no evidence that the shareholders were misled or not informed about the Wakefern debt. Second, Patterson's

7

assertion that the ownership of Glory Foods was misled is contradicted by his own deposition testimony. Patterson stated during his deposition that he learned of the Wakefern debt in part when he attended a meeting at which one of the owners of Glory Foods discussed the issue. In other words, Patterson has stated that he heard details about the issue from the very people from whom he contends it was kept, thus undermining his claim of concealment.

Because Patterson has not set forth any evidence from which a reasonable person could conclude that Glory Foods employees engaged in wrongdoing, and hence cannot show "a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff," Dzwonar v. McDevitt, 828 A.2d 893, 901 (N.J. 2003), the District Court correctly concluded that he cannot meet the first element of a CEPA claim.

**B.**

The District Court granted summary judgment for the additional reason that Patterson did not engage in protected whistleblowing activity. He contends that his March 1, 2010 email to Neal is protected activity. He is incorrect. His email, which he sent to Neal in response to her inquiry concerning a decline in sales, merely stated his rather banal observation that an accrual program involving free advertising had been in place, that the program had ended, and that sales had dropped as a result. Patterson's email to Neal did not mention any concern that a kickback scheme was in place, or that the underpayment had not been disclosed to shareholders. Indeed, Patterson did not even indicate to Neal his purported concern that Wakefern still owed Glory Foods money

8

because the accrual program had not recouped the entire debt. Nothing in the email suggested that a debt was still due, that wrongdoing had occurred, or that he even believed wrongdoing had occurred. Cf. Carlino v. Gloucester City High Sch., 57 F. Supp. 2d 1, 35-36 (D.N.J. 1999) (granting summary judgment based in part on the fact that the alleged whistleblowing message "in no way suggest[ed] any illegal conduct"); Young, 645 A.2d at 1248 (affirming dismissal of a complaint where the employee complained about a decision that "was not unlawful or wrongful in any way," because CEPA "was not intended to provide a remedy for wrongful discharge for employees who simply disagree with an employer's decision, where that decision is entirely lawful").

Accordingly, Patterson has not shown that he engaged in protected activity, and for this additional reason, the District Court properly granted summary judgment.[8]

**IV.**

For the foregoing reasons, we will affirm the District Court's orders.[9]

---

[8] The causation element of a CEPA claim requires a plaintiff to show that "a causal connection exists between the whistle-blowing activity and the adverse employment action." Dzwonar, 828 A.2d at 900. Because Patterson cannot identify any whistleblowing activity, we need not address this element.

[9] Patterson also appeals the District Court's order denying his motion for reconsideration. See Notice of Appeal, Feb. 28, 2013, ECF No. 58. We will affirm the District Court's order denying Patterson's motion for reconsideration because, as the District Court concluded, his reconsideration motion merely "rehash[ed] his rejected argument" from his brief in opposition to summary judgment, Letter Order 2, Feb. 1, 2013, ECF No. 57, and we have concluded that the District Court properly granted summary judgment.